# EXHIBIT E

**Expert Report of Jeff Noble**

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| Tyree Talley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case no. 1:21-cv-00249 |
| v. | ) | |
| | ) | |
| City of Austin and John Does, | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.    My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.    I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

   a.    I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California.  As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square miles with a population of over 218,000.  I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention.  The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

   b.    In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police.  My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the

1

Exhibit E

Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.  As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.  I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California. I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.  As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption. For example:

a.  In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.  I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations. For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department. In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.  I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.  I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio,

2

Exhibit E

Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.     I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.     I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.     I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.     In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.     I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.     I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.     I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.     As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

Exhibit E

m.   In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.   My experience, training and background are more fully described in my attached resume.

7.   My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.   I reviewed the following material in making my opinions:

- Complaint in *Talley*
- Complaint in *Rodriguez*
- Photographs of Injuries (Talley 001136-1154)
- St. David South Austin Medical Center Records (Talley 001054-1058)
- St. David South Austin Medical Center Records (Rodriguez 00015-21)
- Videos
  - Cherne BWC (COA 004588)
  - Lynch BWC (COA 004591)
  - Cantu-Harkless BWC (COA 004602)
  - Alas BWC (COA 004613)
  - Hethershaw BWC (COA 004613)
  - Cobaugh BWC (COA 004618)
  - Bystander (Talley 00002)
  - Bystander (Talley 00004)
  - Bystander (Talley 00005)
  - Video of Elbow Injury (Tyree 001155)
  - Bystander Video 4 (Video 4)
  - Injury Video – Rodriguez (Rodriguez 0003)
  - Injury Video – Rodriguez (Rodriguez 0004)
- Rodriguez Injury Photographs (Rodriguez 0005-11)
- Jeffrey J. Noble Expert Report in *Sanders v. City of Austin*

9.   At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.  My professional charges for this litigation work is an hourly fee of $400 plus expenses

4

Exhibit E

including all travel time.  My fees for deposition and trial testimony are a flat rate of $2,500 for the first four hours and $600 per hour for every additional hour, plus travel time and expenses.

11.    If I am provided additional materials that changes, alter or amends my opinions, I will prepare a supplemental report.

12.    To ensure my methodology was reliable, my opinions are based on a comprehensive review of the provided materials that establishes my understanding of the facts of the case and on the professional and generally accepted principles and practices in policing as of the date of this incident.  "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field.  A practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.  Generally accepted practices in policing reflect technical and specialized knowledge in the law enforcement field.  A practice can be generally accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice.  Generally accepted practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in agency policies, and in reputable training materials.

13.    To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

14.    My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., is intended to and should be read as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.

15.    The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Summary of Incident**

16.    On May 30, 2020, Tyree Talley, who is deaf, was with a group of protestors near the southeast corner of 8th Street and the I-35 frontage road, across from the Austin police facility, protesting due to the death of George Floyd.

17.    Austin police officers were on the I-35 overpass looking down on the area where Mr. Talley was located and other officers were in a line on the elevated plaza in front of the police department.

18.    At about 9:15 PM, Mr. Talley threw a water bottle in the general direction of the police and then felt something go by his ear.  He felt his ear and realized that he had been shot with a less-lethal munition fired by a police officer.  Less than one second later he was struck in the groin with a projectile and he collapsed in the crosswalk.  Mr. Tyree was then shot 10 more times by APD officers while he was on the ground.

19.    Photographs of Mr. Talley's injuries are consistent with being struck with a 12-guage shotgun bean bag less-lethal projectile.



6



20.    Modesto Rodriguez was with a group of protestors near the southeast corner of 8th Street and the I-35 frontage road, across the street from the Austin Police Department headquarters. Austin police officers were standing on the I-35 bridge that carries interstate traffic above 8th Street and another line of officers was standing at the east end of the plaza in front of APD headquarters.

21.    Mr. Rodriguez, who is deaf, was not given any indication that law enforcement was clearing the area. At about 9:06 PM, Mr. Rodriguez was shot 2-3 times by an unidentified Austin Police officer or officers. One of the rounds struck his ankle and the other struck his chest.

Exhibit E

22.   Photographs of Mr. Rodriguez's injuries are consistent with a less-lethal bean-bag shotgun round or a 40mm less-lethal round.



**Background**

23.   APD's Special Investigations Unit (SIU) investigation into Alyssa Sanders shooting

    a.   APD Special Investigations Unit Investigative Summary[1]

        i.   SIU determined Officer Eric Heim shot Sanders in the head with his 40 mm launcher at 1:55 pm on May 31, 2020.

        ii.   Heim declined to be interviewed.

    b.   APD Special Investigations Unit Powerpoint[2]

        i.   SIU determined Officer Eric Heim fired from 60 feet away and hit Alyssa Sanders with a 40 mm launcher loaded with a foam baton at 1:55:50 (Slide 11)

        ii.   SIU diagrammed the layout of the officers with APD officers aligned North-South across Cesar Chavez facing protesters to the East, with a front line of Bicycle Public Order Team (BPOT) officers followed by a line of Special Response Team (SRT) officers, which included Heim. SIU determined that the officer with the best view of Sanders, Jared Ralston, was standing in the front line with bike officers, while Heim was behind and to Ralston's left. (Slide 12)

        iii.   SIU claimed the intended target was a person who threw a disposable water bottle. (Slides 11 and 12)

---

[1] COA-Sanders 0005.
[2] COA-Sanders 0649.

Exhibit E

    c.   Officer Jared Ralston Body-worn camera footage[3]

        i.   T18:55:36 – Ralston begins pushing on protesters and saying "get back" repeatedly.

        ii.   T18:55:39 – The protester immediately opposite Ralston falls backwards after he pushes her.

        iii.   T18:55:42 – Another protester falls backward after being pushed by officers.

        iv.   T18:55:43 – A pile of three fallen protesters is visible in front of Ralston.

        v.   T18:55:46 - In the center of the screen, in front and to the right of Sanders' white sign, is a person with a dark face-covering and black clothing; this person pulls their right arm back and throws a disposable water bottle in an overhand motion towards the line of officers.

        vi.   T18:55:46 – As the disposable bottle flies through the air, a thud sound is audible, followed by a clicking sound of emptying a weapon's chamber. Immediately after the thud, Sanders is visible falling with her orange water jug.

        vii.   T18:55:46–51 - The person who threw the bottle turns away from police and looks down at Sanders on the ground before walking past her and into the crowd.

    d.   Officer Eric Heim Body-Worn Camera Footage[4]

        i.   T18:52:37 – Heim and other APD officers wearing black uniforms and helmets walk into the intersection of Guadalupe Street and Cesar Chavez Street.

        ii.   T18:52:53 – Heim stands facing West—away from Sanders' position—for over a minute. When Heim turns, at 18:54:42, a dense wall of protesters stand within arms reach of the bike patrol officer right in front of Heim.

---

[3]COA-General Protest.015741. *See* Audit Trail (COA-General Protest.015680) (identifying Ralston as the camera operator). SIU requested an "enhanced" video of the impact which appears to be the video marked COA-General Protest.015741.

[4] COA-General Protest.015740. *See* Audit Trail (COA-General Protest.015711) (identifying Heim as the camera operator). Another copy of Heim's footage is marked COA-General Protest.0987641, with another copy of the audit trail marked COA-General Protest.0987639 at 14.

Exhibit E

    iii.   T18:54:03 – Several other officers, including an officer with a less lethal shotgun, are visible on Heim's camera talking to each other and also not looking at the protesters.

    iv.   T18:55:25 – Another officer can be heard beginning to say "move back" repeatedly.

    v.   T18:55:26 – Heim raises his 40 mm launcher to aim to his left while other officers begin pushing the line of protesters back from where they had been standing for several minutes.

    vi.   T18:55:28 – The pushing officers begin to say "get back" repeatedly.

    vii.   T18:55:33 – An officer, possibly Heim, shouts "back up!"

    viii.   T18:55:38 – A clicking sound is heard and Heim's arms recoil, consistent with firing the 40 mm launcher which is aimed to Heim's left. Heim reloads the weapon shortly after. Meanwhile, the line of protesters is visible backing away from the officers.

    ix.   T18:55:43 – Heim lowers his weapon during the reload process, revealing the protesters have backed up almost to the light at the next intersection.

    x.   T18:55:58 – Sanders' orange water jug is visible rolling away from the protesters and towards the police.

e.   Officer Christopher Salacki Body-worn camera footage[5]

    i.   T18:55:26–29 – Salacki moves towards his left with a bicycle as the police line advances.

    ii.   T18:55:27 – Officers begin to repeatedly say "get back."

    iii.   T18:55:33 – Officers to Salacki's left push three protesters to the ground.

    iv.   T18:55:34 – Protesters begin walking and running away from the officers en masse.

    v.   T18:55:37 – The person in dark clothing is seen throwing a disposable water bottle in the top right of the screen. As the water bottle flies

---

[5] COA-General Protest.015739. *See* Audit Trail (COA-General Protest.015724) (identifying Salacki as the camera operator).

toward officers, a thud and clicking sound consistent with Heim's 40 mm launcher is heard.

vi. T18:55:38 – Immediately after the thud sound, Sanders is visible through the legs of other protesters falling with her orange water jug.

vii. T18:55:39–46 – Other protesters stop and bend down to look at Sanders.

f.   Officer Brendan McMorrow's Body-worn camera footage[6]

i. T18:54:52 – Protesters part to allow a metro bus through.

ii. T18:55:09 – Police line parts to allow the bus through.

iii. T18:55:27–28 – Protesters close back onto the police position behind the bus and collide with bikes.

iv. T18:55:35 – A thud and click is audible.

v. T18:55:37 – A less lethal shotgun (elsewhere shown to be Officer Christopher Ash's) is fired from McMorrow's left.

vi. T18:55:39 – Sanders is visible collapsing.

g.   Officer Patrick Walsh's Body-worn camera footage[7]

i. T18:54:54 – Protesters part to allow a metro bus through.

ii. T18:55:03 – The police line parts to allow the bus through.

iii. T18:55:24 – Protesters close back onto the police position.

iv. T18:55:26 – Walsh moves his bike back into position and protesters stop in front of him.

v. T18:55:29 – To Walsh's right, OC spray is used on the protesters.

vi. T18:55:30 – Protesters run back from the police line to Walsh's right.

---

[6] COA-General Protest.015740. *See* Audit Trail (COA-General Protest.015729) (identifying McMorrow as the camera operator).
[7] COA-General Protest.015743. *See* Audit Trail (COA-General Protest.015671) (identifying Walsh as the camera operator).

Exhibit E

vii. T18:55:33 – A less lethal shotgun barrel (elsewhere shown to be Officer Christopher Ash's) is visible to Walsh's immediate left and fires into a group of protesters, many of whom are on the ground, immediately in front of the police line, which is to Walsh's right, as another officer standing to Walsh's right is spraying OC spray into the same pile of protesters.

viii. T18:55:36 – The same less lethal shotgun fires again, aimed low and in the direction of a protester who is on the ground in the same place to Walsh's right.

ix. T18:55:37 – Sanders collapses in the distance as the less lethal shotgun to Walsh's left continues to be pointed at the nearby protesters, not at Sanders.

h. Officer Bridget Cummiskey's Body-worn camera footage[8]

i. T18:55:14 – The metro bus is visible passing through protesters with the police line already opened for it to pass through.

ii. T18:55:33 – Protesters following the bus are grabbed by officers as a bike patrol officer steps forward to push other protesters back.

iii. T18:55:34–40 – Cummiskey steps forward to push into a protester, knocking the protester to the ground.

iv. T18:55:37 – An officer is heard beginning to repeat "get back."

v. T18:55:41 – OC spray is visible, apparently coming from Cummiskey's left.

vi. T18:55:47 – After view of the area has been obstructed for several seconds, Sanders' water jug is visible on the ground.

vii. T18:56:00 – A 40 mm launcher is briefly visible in another officer's hands, apparently Heim.

i. Officer Eric Heim Supplemental Report[9]

i. Officer Heim's report, dated June 8, 2020, recounts being ordered to not allow protesters on the highway to stop traffic and cause disruption, so

---

[8] COA-General Protest.015738. *See* Audit Trail (COA-General Protest.015704) (identifying Cummiskey as the camera operator).
[9] COA-Sanders 0017.

Exhibit E

he was issued a 40mm Less Lethal launcher with Foam Baton rounds. Heim states his squad "was instructed to block the intersection of W Cesar Chavez St and Guadalupe St."

   ii.  During what Heim describes as "BPOT pushing the crowd back using their bicycles," Heim recounts pointing his 40 mm launcher at a "White male wearing a Black Bandanna" who he claims he saw "throw a water bottle at officers." Accordingly, he states he fired one round at "4:45 on my BWC," but "I do not believe I struck the suspect."

j.  Officer Christopher Ash Supplemental Report[10]

   i.  Officer Ash reports that he inadvertently did not have his BWC active during the push following the metro bus, but that he deployed his less lethal shotgun twice towards protesters who he claims were pushing on bike patrol officers' line.

   ii.  Officer Ash's report is consistent with the less lethal shotgun seen firing twice in the BWC, most clearly on Officer Walsh's video.

k.  Det. Steven McCormick Investigator's Report[11]

   i.  After recounting information from Sanders' mother and other officers present, McCormick recounts an interview with Heim's supervisor, SRT Sergeant Brian Molleur conducted on August 20, 2020.[12]

   ii.  According to Molleur, he was not working with his normal group of SRT officers but instead a group of SRT-trained officers assigned for that particular weekend.

   iii.  Molleur claimed "[t]here were no specific directions or instructions given to officers regarding deployment of less lethal options," but they had received information that "there were protesters at City Hall … spilling into the street." SRT was instructed to "work with BPOT officers to block off Cesar Chavez at Guadalupe."

   iv.  An email from McCormick to the Travis County District Attorney recounts this same statement from Molleur that "I also spoke with Sgt. Molleur today. The troops were not given any specific directive regarding deployment of the less lethal. I dropped the audio file in Techshare if you

---

[10] COA-Sanders 0016.
[11] COA-Sanders 0022.
[12] COA-Sanders 0029¬-30)

want to review it, its not too long."[13]

l. Det. Steven McCormick interview with Sergeant Brian Molleur[14]

    i. 0:36 – Molleur confirms he was supervising Heim on May 31, 2020

    ii. 0:44 – Molleur confirms that he and his team of SRT officers were sent in direct response to a "large group" that "congregated" in front of City Hall.

    iii. 0:56 – Molleur states the radio reported the crowd was spilling into the roadway.

    iv. 1:20 – Molleur states they were ordered to march in and "assist with crowd control."

    v. 1:55 – Molleur states they were ordered to "hold the line" with bike patrol officers.

    vi. 3:24 – Molleur states he did not give his officers any specific instructions about the use of force or less lethal weapons.

    vii. 3:55 – Molleur states he was not aware Heim fired the less lethal weapon.

m. A grand jury indicted Eric Heim for aggravated assault by a public servant on February 17, 2022 for shooting Alyssa Sanders with a 40 mm launcher.[15]

n. Dell Seton Medical Records[16]

    i. Sanders is noted to be 26 years old, presenting with a gunshot wound to the right temple with a "rubber bullet" while at Austin protests, soreness on her chest after falling, a large bruise on her temple, and swelling on her temple. Physicians noted a subarachnoid hemorrhage and subdural hematoma. She was discharged on June 3, 2020.[17]

o. Austin-Travis County EMS[18]

    i. EMS records reflect Sanders reported being hit with a less lethal round

---

[13] COA-Sanders 0033.
[14] COA-Sanders 0054.
[15] COA-Sanders 0055–056
[16] COA-Sanders 0057–475.
[17] COA-Sanders 62.
[18] COA-Sanders 0476-481.

14

about 10 minutes before their arrived, which they reported as 2:12 pm.

    ii. EMS documented that Sanders was crying and complaining of pain to the right side of her head and arms.

24.     APD's Internal Affairs (IA) investigation into Alyssa Sanders shooting

    a. APD Internal Affairs Investigative Summary[19]

        i. IA determined that Officer Eric Heim shot Alyssa Sanders in the head with a 40mm less lethal impact launcher at 1:55 pm on May 31, 2020.

        ii. IA noted that Sanders' skull was fractured.

        iii. IA noted that Sanders was standing next to a person who threw an object when she was shot by Officer Heim.

    b. A document titled "SRT LL Checkout" is dated May 31, 2020 and has Heim's name and number next to the words "40mm(S21)."[20]

    c. Heim's Statement to IA[21]

        i. Heim repeats his assertion that he fired because the crowd was rioting and "a white male wearing a black bandana step[ped] out from the crowd" who "had a water bottle in his hand, … and … he started to throw it." "As the male was throwing the water bottle, I took aim. I fired one shot. I don't believe I hit him. … he disappeared into the crowd really quick."[22]

        ii. Later Heim describes firing when "there was a large gap … where people had ran from. I see a white male in a black bandana step out from the crowd. He has a water bottle … [and] throws it at Officers. As he's throwing it, I see him, I take aim with my 40 millimeter. I fire one round. … I don't know if it struck him. … he immediately turned and ran into the crowd."[23]

        Heim said he saw the round went to the right of the man he said he aimed at.[24]

---

[19] COA-General Protest.014731.
[20] COA-General Protest.014806.
[21] COA-General Protest.015514.
[22] COA-General Protest.015518.
[23] COA-General Protest.015527.
[24] COA-General Protest.015528.

Exhibit E

    iii.  Heim stated that he saw the person he aimed at in Officer Ralston's body-worn camera footage, in an excerpt prepared by IA at the 854 mark.[25] Ralston's video excerpt by IA is marked COA-General Protest.015736 in this litigation, so the timestamp for the 8:54 duration mentioned in Heim's interview is T18:55:45–46.

    iv.  Heim recalled "between the 29th and 30th we had gotten briefings on how to use" less lethal weapons.[26]

    v.  Heim recalled that the instructions came from multiple supervisors, as well as lieutenants who would verbally order him to shoot specific protesters.[27]

    vi.  Heim stated he was issued and told to take the 40 mm launcher that day.[28]

    vii.  Heim stated that he had been trained the 40 mm launcher was appropriate for "any riotous crowd control."[29]

    viii.  Heim stated he believed he adhered to APD policy.

25.    Other video of Alyssa Sanders' shooting

    a.  The SIU investigation evidently surveyed numerous other officers' videos, *see* COA-Sanders.0616, but they were not organized as part of the SIU file that I received and I have not found a comprehensive list of what SIU reviewed as part of the Sanders investigation. Likewise, I have not found a comprehensive list of what IA reviewed as part of the Sanders investigation. The following videos offer other potentially relevant views of the shooting or its aftermath and the conduct of officers nearby.

    b.  Officer Phillip Macri's Body-worn camera footage(COA-General Protest.0987164)[30]

      i.  T18:55:29 – Officers are heard beginning to repeat "get back."

      ii.  T18:55:39 – Sanders is visible collapsing.

---

[25] COA-General Protest.015532.
[26] COA-General Protest.015520.
[27] COA-General Protest.015521.
[28] COA-General Protest.015521.
[29] COA-General Protest.015522.
[30] *See* Audit Trail (COA-General Protest.0987157) at 42 (identifying Macri as the camera operator).

16

c. Officer Christian Maynes' Body-worn camera footage (COA-General Protest.0987648)[31]

  i. T18:55:41 – Sanders is visible collapsing.

d. Officer Michael Guetske's Boy-worn camera footage (COA-General Protest.987654)[32]

  i. T18:55:26 – Officers are audible saying "move back."

  ii. T18:55:29 – Officer with green backpack (elsewhere shown to be officer John Ncklason) is visible with a 40mm launcher.

  iii. T18:55:32 – Barrel of the 40mm launcher is briefly visible, held by same officer with green backpack.

  iv. T18:55:34–39 – Officer with green backpack with 40 mm launcher holds the launcher with the barrel pointed down during a struggle with a protester, then moves off screen to the left with the barrel pointed at the ground.

  v. T18:55:39 – As the officer with the green backpack moves off screen to the left, a different officer (consistent with Heim's location) is briefly visible on the right of the screen lowering the barrel of a 40mm launcher which is pointing out towards Sanders' location.

  vi. T18:55:40 – Sanders is briefly visible, having already collapsed.

  vii. T18:55:42 – Sanders is again briefly visible with other protesters assisting her.

  viii. This video shows the officer with the green backpack was also equipped with a 40 mm launcher, but did not shoot Sanders.

e. Officer Michael Endres' Body-worn camera footage (COA-General Protest.0987467)[33]

  i. This video does not show Sanders' shooting but shows a closer view of the officer with the green backpack above (elsewhere shown to be officer

---

[31] *See* Audit Trail (COA-General Protest.0987639) at 50 (identifying Maynes as the camera operator).

[32] *See* Audit Trail (COA-General Protest.987653) at 8 (identifying Guetske as camera operator).

[33] *See* Audit Trail (COA-General Protest.000987463) at 14 (identifying Endres as the camera operator).

Exhibit E

John Ncklason), and confirms, together with COA-General Protest.987654, that the officer with the green backpack did not fire during the relevant time.

f.  Officer John Nicklason's Body-worn camera footage (COA-General Protest.0987656)[34]

    i.  Nicklason's viewpoint shows he is the officer with the green backpack shown in COA-General Protest.0987467 and COA-General Protest.987654.

    ii.  T18:55:26 – Officer can be heard saying "move back" repeatedly.

    iii.  T18:55:28 – Officer can be heard beginning to say "get back" repeatedly.

    iv.  T18:55:30-34 – Heim's 40 mm launcher is briefly visible several times to Nicklason's right.

    v.  T18:55:38 – Sanders collapses (while Nicklason's 40 mm launcher is pointed at the ground).

g.  Officer Jeremy Fisher's Body-worn camera footage (COA-General Protest.0987628)[35]

    i.  T18:55:43 – Officers are heard saying "move back."

    ii.  T18:55:45 – Officers are heard saying "get back."

    iii.  T18:55:55–57 – On the right top corner of the screen, officer Heim holds a 40 mm launcher aimed toward the crowd, then lowers the barrel.

    iv.  T18:55:57 – On the left top corner of the screen, Sanders is visible already collapsed.

h.  Officer Britton Taylor's Body-worn camera footage (COA-General Protest.0987655)[36]

    i.  T18:55:24 – Officer can be heard saying "move back."

    ii.  T18:55:27 – Officer can be heard saying "get back."

---

[34] *See* Audit Trail (COA-General Protest.0987653 at 20 (identifying Nicklason as the camera operator).
[35] *See* Audit Trail (COA-General Protest.0987610) at 48 (identifying Fisher as the camera operator).
[36] *See* Audit Trail (COA-General Protest.0987653) at 14 (identifying Taylor as the camera operator).

iii. T18:55:29 – Officer Heim, with 40 mm launcher, is aiming into the crowd.

iv. T18:55:39 – Sanders is visible already collapsed.

i. Officer Michael Crumrine's Body-worn camera footage (COA-General Protest.0987659)[37]

    i. T18:55:34–36 – Officer Heim visible in distance aiming 40 mm launcher into the crowd.

    ii. T18:55:40 – Sanders is visible already collapsed.

j. Officer Joseph Murray's Body-worn camera footage (COA-General Protest.0987316)[38]

    i. T18:55:25 – Another officer begins to say "move back."

    ii. T18:55:30–33 – Officer Heim to the far right intermittently visible raising 40 mm launcher to aim at the crowd.

k. Officer Billy Simoneaux's Body-worn camera footage (COA-General Protest.015737)[39]

    i. T18:55:33 – Officers begin repeating "get back."

    ii. T18:55:43 – Protesters stop and congregate in the place where Sanders is visible falling in the other videos, but obscure her fall from this viewpoint.

    iii. T18:55:44 – Sanders' white sign and orange water jug are briefly visible on the ground.

l. Officer Keston Campbell's Body-worn camera footage (COA-General Protest.0987684)[40]

    i. T18:55:01 – Sanders is visible with an orange water jug and white sign stepping aside for the metro bus.

    ii. T18:55:31 – Officer to the right uses OC spray and the crowd runs away.

---

[37] *See* Audit Trail (COA-General Protest.0987653) at 34 (identifying Crumrine as the camera operator).

[38] *See* Audit Trail (COA-General Protest.0987306) at 40 (identifying Murray as the operator of the camera).

[39] *See* Audit Trail (COA-General Protest.015693).

[40] *See* Audit Trail (COA-General Protest.0987677) at 47 (identifying Keston Campbell as the operator of the camera); *see also* COA-Sanders 0642 (same video).

       iii.  T18:55:38 – Sanders collapses.

m.  Officer Adam Collins' Body-worn camera footage (COA-General Protest.0987155)[41]

       i.  T18:55:28 – Officer to Collins' left begins repeating "get back." 40 mm launcher barrel briefly visible to Collins' right.

       ii.  T18:55:32 – Officer Heim, with 40 mm launcher, steps forward in front of Collins.

       iii.  T18:55:35 – Officer to Collins' front left shoots OC spray into crowd.

       iv.  T18:55:38 – Heim's 40 mm launcher is aimed into crowd in front of Collins and then barrel briefly visible to Collins' right.

       v.  T18:55:39 – Sanders is briefly visible, already fallen on the ground.

n.  Officer Nathan Ruiz's Body-worn camera footage (COA-General Protest.0987647)[42]

       i.  T18:55:26 - Officers are audible saying "move back."

       ii.  T18:55:28 – Officers are audible repeating "get back."

       iii.  T18:55:38 – Sanders is barely visible falling.

o.  Officer Stephen Johnson Body-worn camera footage (COA-General Protest.0986704)[43]

       i.  T18:55:26 – Officers push against protesters after metro bus passes.

       ii.  T18:55:40 – Officer to Johnson's left begins to use OC spray.

       iii.  T18:55:39 - Sanders is visible already collapsed.

p.  Officer Dustin Lowe's Body-worn camera footage (COA-General Protest.0987686)[44]

---

[41] *See* Audit Log (COA-General Protest.0987124) at 96 (identifying Collins as camera operator).
[42] *See* Audit Log (COA-General Protest.0987639) at 34 (identifying Ruiz as camera operator).
[43] *See* Audit Log (COA-General Protest.0986710) at 36 (identifying Johnson as camera operator).
[44] *See* Audit Log (COA-General Protest.0987677) at 63 (identifying Lowe as camera operator).

Exhibit E

      i.   T18:55:34 – Protesters begin running from police line.

     ii.   T18:55:42 – Sanders' orange water jug is visible fallen on Lowe's far left in the distance.

q.   Officer Vanessa Jimenez's Body-worn camera footage (COA-General Protest.00987640)[45]

      i.   T18:55:29 – Protesters begin running back from police line.

     ii.   T18:55:37-38 – Sanders collapses in the distance.

r.   Officer Chris Carlisle's Body-worn camera footage (COA-General Protest.0987354)[46]

      i.   T18:55:33 – Carlisle turns away briefly, and when he turns back around the protesters are visible running from police line.

     ii.   T18:55:52 – Carlisle orders nearby officers to "move it forward."

    iii.   T18:55:57 – Sanders' orange water jug is visible rolling towards the officers.

s.   Officer Anthony Allegretti's Body-worn camera footage (COA-General Protest.0987332)[47]

      i.   T18:55:41 – Sanders is visible, already collapsed, in the distance on the left

t.   Officer Ana Aguilar's Body-worn camera footage (COA-General Protest.0987306)[48]

      i.   T18:55:44 – Sanders' orange water jug is visible, already fallen on the ground.

u.   Officer Lawrence Nicoletti's Body-worn camera footage (COA-General Protest.0987677)[49]

---

[45] *See* Audit Log (COA-General Protest.0987639) at 5 (identifying Jimenez as camera operator)
[46] *See* Audit Log (COA-General Protest.0987353) at 7 (identifying Carlisle as camera operator)
[47] *See* Audit Log (COA-General Protest.0987331) at 10 (identifying Allegretti as camera operator)
[48] *See* Audit Log (COA-General Protest.0987306) (identifying Aguilar as camera operator)
[49] *See* Audit Log (COA-General Protest.0987677) (identifying Nicoletti as camera operator)

Exhibit E

      i. T18:55:42 – Sanders is visible already collapsed on the left side of the screen.

   v. Officer Michelle Borton's Body-worn camera footage (COA-General Protest.0987685)[50]

      i. T18:55:25 – Sanders is visible already collapsed.

   w. Officer Jeremy Bolin's Body-worn camera footage (COA-General Protest.0987676)[51]

      i. T18:55:41 – Sanders is visible already collapsed.

   x. Officer Richard Spitler's Body-worn camera footage (COA-General Protest.987657)[52]

      i. T18:55:43 – Sanders is visible already collapsed.

   y. Officer Michael Carter's Body-worn camera footage (COA-General Protest.0987331)[53]

      i. T18:55:41 – Sanders is visible already collapsed.

   z. Officer Daniel McCameron's Body-worn camera footage (COA-General Protest.0987663)[54]

      i. T18:55:38 – Sanders visible already falling.

  aa. Officer Christopher Bell's Body-worn camera footage (COA-General Protest.0987664)[55]

      i. T18:55:39 – Sanders is visible already collapsed.

  bb. Officer Brice Bishop's Body-worn camera footage (COA-General Protest.987321)[56]

      i. T18:55:40 – Sanders is visible already collapsed.

---

[50] *See* Audit Log (COA-General Protest.0987677) at 58 (identifying Borton as camera operator)

[51] *See* Audit Log (COA-General Protest.0987665) at 75 (identifying Bolin as camera operator)

[52] *See* Audit Log (COA-General Protest.0987653) at 26 (identifying Spitler as camera operator)

[53] *See* Audit Log (COA-General Protest.0987331) (identifying Carter as camera operator)

[54] *See* Audit Log (COA-General Protest.0987653) at 49 (identifying McCameron as camera operator)

[55] *See* Audit Log (COA-General Protest.0987653) at 54 (identifying Bell as camera operator)

[56] *See* Audit Log (COA-General Protest.0987319) at 32 (identifying Bishop as the camera operator).

Exhibit E

cc.  Officer Ashley Uniszkiewicz's Body-worn camera footage (COA-General
  Protest.0987675)[57]

    i.  T18:55:39 – Sanders is visible already collapsed.

dd. Officer Christopher Irwin's Body-worn camera footage (COA-General
  Protest.0987660)[58]

    i.  T18:55:49 – Sanders is visible already collapsed.

ee. Officer Rolan Rast's Body-worn camera footage (COA-General
  Protest.0987313)[59]

    i.  T18:55:50 – Sanders is visible already collapsed on the far left.

26.  APD Investigation into Nicole Underwood shooting

    a.  City of Austin Responses to Interrogatories in *Underwood v. City of Austin*

        i.  "On May 30, 2020, during the events, Plaintiff, Nicole Underwood, was
    struck by a less-lethal bean bag round that was deployed by Officer
    Siegel." Page 3.

    b.  APD Internal Affairs Division Investigation Summary, COA-General
  Protest.015747

        i.  APD determined that Officer Siegel shot Ms. Underwood.

        ii.  During the investigation, one of the corporals on scene told Internal
    Affairs that the use of the less lethal shotguns was unlike his normal
    experience in patrol, and also unlike how APD handled an earlier riot
    situation.

        iii.  According to that corporal, he was uncomfortable with Officer Siegel's
    explanation for the rules of engagement at the scene.

        iv.  Officer Siegel told Internal Affairs that "we were also given a lot of
    instructions for those of us who had the less lethal shotguns to deploy
    the rounds at people throwing objects at us. And we were given that

---

[57] *See* Audit Log (COA-General Protest.0987665) at 66 (identifying Uniszkiewicz as the camera operator).
[58] *See* Audit Log (COA-General Protest.0987665) at 38 (identifying Irwin as the camera operator).
[59] *See* Audit Log (COA-General Protest.0987306) at 27 (identifying Rast as the camera operator).

23

instruction several times."

    v. Although Officer Siegel repeatedly said he could not recall shooting Ms. Underwood or explain why he did so, apparently after perusing the video evidence and being prompted by investigators, he identified a different person who threw an object seven seconds before Officer Siegel shot Ms. Underwood. COA-General Protest.015757. Nonetheless, Officer Siegel still reported that "I don't know who I'm aiming at" when he shoots Ms. Underwood.

    vi. APD's report noted that Ms. Underwood had to be hospitalized because the round penetrated her chest cavity.

c. Officer John Siegel's Body-worn camera footage (COA Gallagher 0002019)

    i. Less than a minute after the use of force against Gallagher, Officer Siegel fired a less lethal shotgun at a woman later identified as Nicole Underwood. Timestamp 21:30:48.

    ii. Siegel's footage shows that Underwood was standing peacefully in the seconds before Siegel shot her. Timestamp 21:30:46–48.

    iii. Immediately after Siegel fires, Underwood grabs her chest and falls to the ground. Timestamp 21:30:48.

d. Officer Ricker's Body-worn camera footage - COA-General Protest.017757

    i. This video shows a different angle of the same shooting.

    ii. Nicole Underwood can be seen at the middle of the screen protesting and doing nothing threatening.

    iii. At duration 38 seconds, Officer Siegel can be seen and heard shooting twice at Ms. Underwood, hitting her and the man in front of her.

    iv. Ms. Underwood immediately collapses to the ground.

e. Air 1 Video [clip] – COA-General Protest.017761 and – COA-General Protest.010033

    i. These videos show aerial footage of the same incident.

    ii. Nicole Underwood can be seen at the middle of the screen protesting and doing nothing threatening.

24

iii. With even further context, no one around Ms. Underwood is doing anything remotely threatening or justifying force.

iv. No one near Ms. Underwood appears to be throwing anything.

v. At duration 11 seconds, Siegel turns to an officer behind his left shoulder and takes an object from the officer. Siegel's helmet does not turn back to the crowd until duration 14 seconds.

vi. At duration 18 seconds, Siegel is visible aiming his shotgun at Ms. Underwood and the white beanbag projectile exits the shotgun muzzle and strikes Ms. Underwood. She collapses to the ground, sliding down the embankment.

vii. During the entire four second period after Siegel turns his attention back to the crowd until he opens fire, none of the people near Ms. Underwood throws anything or otherwise does anything threatening.

f.  Sergeant Bustos Body Worn Camera - COA-Gallagher-4780

i. This video shows a supervisor talking briefly with Officer Siegel moments after he shot Nicole Underwood and pepper sprayed Jason Gallagher.

ii. Sgt. Bustos appears to ask Siegel "what targets were you identifying when you were deploying?"

iii. Siegel responds "they run away when I shoot 'em. I don't see any right now."

iv. Bustos concludes the interaction by saying "just remember, weapons discipline" before turning away from Siegel.

g.  "Siegel, John R2R Smartsheet-2" (COA-General Protest.011210–13) concerns Officer Siegel's conduct during the relevant time.

i. This document reflects the review of Officer Siegel's conduct on May 30, 2020 by Gary Jaime.

ii. Jaime notes in his review that Siegel appears to deploy his shotgun at protesters approximately 31 times. While Jaime notes that it is unclear who Siegel is shooting at and why, Jaime nevertheless concludes that his shots appeared to comply with law and general orders.

25

    iii.   The same document reflects a review of Office Siegel's conduct by Lieutenant Christopher Leleux. While Leleux find that each of Siegel's shots were in response to "riotous behavior," Leleux found that Siegel often fired multiple shots at subjects at a time and reasoned that rapid succession shots were "neither judicious or appropriate considering the angles that he was firing at, and more importantly the dense crowd that surrounded the subjects he was firing upon." Further, Leleux found that Siegel's R2R reporting was deficient because it was late, vague, and insufficient. As such, Leleux concludes that Siegel may have violated APD general orders.

    iv.   The same document also includes Commander Chris Vallejo's review notes. Cmdr. Vallejo found that "Officer Siegel's lack of articulation and lack of legal justification for firing his less-lethal shotgun may have violated various aspects of the department's response to resistance policies." As a result, Cmdr. Vallejo referred Siegel's case to the Internal Affairs Department.

h.   Officer John Siegel's Deposition – February 16, 2022

    i.   Siegel refused to answer and pled the Fifth Amendment in response to many questions about Underwood and less lethal shotguns.[60]

    ii.   When Officer Siegel was asked if he intentionally shot Nicole Underwood, he pled the Fifth Amendment.[61]

    iii.   When asked if Nicole Underwood did "anything that was remotely dangerous or wrong before" Siegel shot her, Siegel pled the Fifth Amendment.[62]

i.   Sgt. Javier Bustos Deposition – October 19, 2022

    i.   Sgt. Bustos stated that he was not provided any guidance or tactical instructions before he was deployed as a supervisor on the IH-35 bridge on May 30, 2020.[63]

    ii.   Sgt. Bustos testified that officers were firing into crowds as a means of crowd control.[64]

---

[60] Deposition of J. Siegel, 67–68, 113–117, 119–121, 135–139, 148–150, 157, 173–175, 203, 208–211, 213, 216–218, 226.
[61] Deposition of J. Siegel, at 174.
[62] Deposition of J. Siegel, at 175.
[63] Deposition of J. Bustos, at 85.
[64] Deposition of J. Bustos, at 86.

26

27. Saraneka Martin and Jose Herrera shooting documents.

    a. APD Internal Affairs Division Investigative Summary, COA-General Protest.022084

        i. APD's internal investigation identifies officer Daniel McCameron and Kyu An as the officers who shot Ms. Martin.

        ii. The summary notes that officers were specifically ordered to deviate from policy requirements by not writing a details page for their uses of force at the protests that weekend. COA-General Protest.022086.

        iii. This instruction was ultimately countermanded on June 11, 2020. COA-General Protest.022086.

        iv. The IA summary notes that officers Mark Bozyk and Christopher Salacki witnessed the use of force against Ms. Martin. COA-General Protest.022087.

        v. After being shown the body worn camera footage, Officer McCameron reported that he shot Ms. Martin because she "displayed an 'aggressive' level of resistance" by throwing the water bottle, and claimed he was aiming for her thigh. COA-General Protest.022089.

        vi. Officer An reported that officers were ordered that "if you have the less lethal and you observe somebody either throwing a projectile, throwing any objects, uh, our order was to impact them." COA-General Protest.022089.

        vii. Officer An also reported that he noticed the less lethal rounds were inaccurate as he used them throughout the day. COA-General Protest.022091.

        viii. APD's internal records reflect over 150 incidents involving the use of less lethal energy projectile weapons during the weekend of protests at issue. Although the reporting system is inconsistent, it tallies at least 511 "R2R's" (i.e., "responses to resistance," APD's euphemism for uses of force) across 177 incidents involving APD officers using less lethal weapons.[65] My understanding is that only a small fraction of the records underlying each incident has been disclosed in this litigation.

---

[65] COA-General Protest.0234143.

b. Officer Ana Aguilar's Body Worn Camera from May 30, 2020, COA-General Protest.022475, shows the shooting of Mr. Herrera and Ms. Martin.

    i. At about 6:51 pm (23:51 on the video's timestamp, which is approximately 5 hours "ahead" of real time), another shooting victim can be seen in the distance wearing pink shorts and a pink shirt. This woman later complained to the police that she was shot despite being pregnant, identifying herself as either Saraneka Martin or Saraniqua Alexander, discussed above.

    ii. Based on the "citizen video" at COA-General Protest.022629, Ms. Martin throws the disposable water bottle at approximately timestamp 23:51:22–23.

    iii. At timestamp 23:51:23–24, the water bottle harmlessly lands on the sidewalk in front of where APD officers were stationed on the steps.

    iv. At timestamp 23:51:26, Ms. Martin reacts to being shot.

    v. As Ms. Martin is shot, Mr. Herrera can be seen walking to the APD officers' right holding an opened black umbrella towards the officers, presumably to protect his body from weapons fire.

    vi. Mr. Herrera looks toward Ms. Martin, then steps slightly toward the police line and gestures with his visibly empty free hand. Timestamp 23:51:35.

    vii. Mr. Herrera remains at the same distance from APD officers, holding his umbrella and walking slowly to the officers' left, for the next 47 seconds, when APD officers again open fire, with two shots audible on the video. Timestamp 23:52:22.

    viii. After those shots, Mr. Herrera spreads both arms to his sides, thus moving the umbrella away from his body. Then another shot rings out. Timestamp 23:52:26. Mr. Herrera flinches, shields himself with the umbrella again, reaches down to grab something from the street, then walks to the officers' right briefly before turning to walk to the sidewalk opposite APD officers, visibly limping. Timestamp 23:52:45.

c. Officer Mark Bozyk's Body Worn Camera from May 30, 2020, COA-General Protest.222476.

    i. Ms. Martin can briefly be seen throwing the disposable water bottle at timestamp 23:51:24 (thus, this video's timestamp is one to two seconds

28

"ahead" of Officer Aguilar's).

    ii. During this period, none of the other four officers with less lethal shotguns visible on Officer Bozyk's footage are shown firing their weapons, although Officer Bozyk's camera is completely obscured for part of that time.

d. Officer Adam Farris' Body Worn Camera from May 30, 2020, COA-General Protest.22498, shows the shooting of Ms. Martin but the shooting of Mr. Herrera is obscured.

    i. At timestamp 23:50:38, Officer Farris, who had been standing on a brick wall, hands his less lethal shotgun to a different officer, wearing a black uniform, and steps down from the wall. This corresponds to the same handoff shown from the receiving officer's perspective in Officer An's video discussed below (COA-General Protest.22550), reflecting that Officer Farris gave his less lethal shotgun to Officer An, that Officer An is wearing a black uniform, and that Officer An is standing on the brick wall at the relevant time.

    ii. Ms. Martin can be seen throwing the disposable water bottle at timestamp 23:51:21.

    iii. At timestamp 23:51:18, Officer Farris directs "Cast" to step up onto a brick wall to Officer Farris' left.

    iv. At timestamp 23:51:22, Officer An—wearing a black uniform and still standing to Officer Farris' front and left on the brick wall—fires in Ms. Martin's direction. Officer An fires again at 23:51:23 and appears to fire a third time at 23:51:24.

    v. At timestamp 23:51:34–45, Officer Farris has a conversation with a different officer in a black uniform, wielding a less lethal shotgun, with his face shield raised and standing to Officer Farris' immediate <u>right</u>. Based on the officers' positions and Officer James Morgan's body-worn camera footage (COA Herrera 005) discussed below, the officer in black appears to be Officer James Morgan.

    vi. At timestamp 23:51:43, an officer wearing blue and wielding a less lethal shotgun is visible to Officer Morgan's right, and Officer Morgan can be seen standing at the top of the stairs just to the left of the center bannister—further consistent with Officer Morgan's video (COA Herrera 005).

29

vii. At timestamp 23:52:19–21, Officer An, still wearing the black uniform and standing on the brick wall to Officer Farris' <u>left</u>, fires twice. Officer An's video discussed below (COA-General Protest.22550) is also consistent with his position relative to Officer Farris and the timing of his shots on Officer An's video. While Officer An is firing, Mr. Herrera is standing with the umbrella covering his body.

viii. As Officer An lowers his shotgun's muzzle at timestamp 23:52:22, Mr. Herrera spreads his arms and thus holds the umbrella to his side, no longer covering his body.

ix. At timestamp 23:52:23, a less lethal shotgun muzzle is visible to Officer Farris' immediate <u>right</u>, and the weapon discharges at the same moment Mr. Herrera flinches in the other videos (just after Mr. Herrera spreads his arms to his sides, 62–63 seconds after Ms. Martin throws the disposable water bottle). Mr. Herrera is obscured at that moment in this video. The shotgun discharging appears to be held by Officer Morgan, whose video (COA Herrera 005) is discussed below.

x. Based on Officer Farris' position at timestamp 23:52:23, the officer whose weapon is seen discharging is not Officer Cast, An, or Bozyk. Officer Bozyk is on the brick wall much further to the right based on his video (COA-General Protest.222476) and Officer An's video (COA-General Protest.22550). As discussed above, Officer An is to the left of Officer Farris. Officer Farris ordered Cast to his left earlier in this video at timestamp 23:51:18.

e. Officer Brent Gray's Body Worn Camera from May 30, 2020, COA-General Protest.22530, shows the shooting of Ms. Martin but the shooting of Mr. Herrera is obscured.

i. At timestamp 23:50:36–38, Officer An collects a less lethal shotgun from Officer Farris, as discussed above and shown in Officer Farris' video (COA-General Protest.22498).

ii. At timestamp 23:51:23 Ms. Martin steps forward and throws a disposable water bottle, which lands in the street and bounces onto the sidewalk.

iii. At timestamp 23:51:25, officers open fire and Ms. Martin turns away and retreats.

iv. Mr. Herrera looks at Ms. Martin, then walks slightly toward the APD officers and gestures with an empty hand at timestamp 23:51:39, keeping his black umbrella in front of his body.

    v.  At timestamp 23:52:22, officers open fire again after Mr. Herrera has walked further to the officers' left, still shielding himself with the black umbrella.

    vi.  Mr. Herrera spreads his arms to his sides, leaving his body unprotected by the umbrella at timestamp 23:52:24. At that moment, the camera passes behind the head of the officer in front, and another shot can be heard.

    vii.  When he is visible against at 23:52:28, Mr. Herrera is shielding himself with the umbrella and bending down to retrieve something from the ground.

    viii.  Seconds later, Mr. Herrera has made his way to the edge of the street in a slow, limping walk, and appears to be in pain at timestamp 23:52:50.

f.  Officer Kyu An's Body Worn Camera from May 30, 2020, COA-General Protest.22550, shows the shooting of Ms. Martin but the shooting of Mr. Herrera is obscured.

    i.  At the relevant time, Officer An is in what appears to be an elevated position, above the top of the stairs.

    ii.  At timestamp 23:51:24, Ms. Martin throws the disposable water bottle and it hits the street.

    iii.  At timestamp 23:51:26–27, Officer An fires his less lethal shotgun at Ms. Martin approximately twice.

    iv.  At timestamp 23:51:49, two officers matching Officer Farris and Officer Morgan from Officer Farris' footage (COA-General Protest.22498) are visible on Officer An's footage. This view shows the pair of officers standing at the top of the steps just to the left of the center bannister— to Officer An's right.

    v.  At timestamp 23:52:21–22, Officer An fires his less lethal shotgun twice in quick succession.

    vi.  At timestamp 23:52:24, the camera is obscured by Officer An's shotgun so Mr. Herrera is not visible, but Officer An is not firing during the time when Mr. Herrera is hit based on Officer Aguilar's footage (COA-General Protest.022475).

    vii.   At timestamp 23:52:28, Officer An fires his shotgun again.

    viii.   At timestamp 23:52:32, none of the officers standing between Officer An's position and Officer Farris (based on COA-General Protest.22498) are holding a less lethal shotgun.

    ix.   At timestamp 23:52:47–48, an officer wielding a less lethal shotgun steps down from a brick wall. This is consistent with Officer Bozyk's first-person view at timestamp 23:52:48–49 in Officer Bozyk's video (COA-General Protest.022476).

g.   Officer James Morgan's Body Worn Camera from May 30, 2020, COA Herrera 005, shows the officer shoot Mr. Herrera. (The footage is identified by COA Herrera 050.)

    i.   The video begins at timestamp 23:51:37, after the events regarding Ms. Martin have resolved.

    ii.   Officer Morgan is positioned at the top of the stairs with a less lethal shotgun, to the immediate left of the center bannister.

    iii.   A different officer with a less lethal shotgun in a blue uniform is briefly visible to Officer Morgan's right at 23:51:52–57, and then again from 23:52:05 until after the sequence with Mr. Herrera. The officer in blue does not appear to discharge her less lethal shotgun during the relevant time.

    iv.   Officer Morgan activates the camera recording at 23:52:08, so that initiates audio recording after his conversation with Officer Farris has ended, discussed above relating to Officer Farris' footage (COA-General Protest.022498).

    v.   Mr. Herrera is visible walking with his umbrella to the left side of the screen at 23:52:18.

    vi.   Mr. Herrera gestures, moving the umbrella away from his body, at 23:52:23.

    vii.   Officer Morgan aims his less lethal shotgun directly at Herrera, then fires at 23:52:24, while Mr. Herrera has the umbrella away from his body and is visibly unarmed. Mr. Herrera is seen flinching immediately after Officer Morgan fires at him.

    viii.   Officer Morgan later leaves his position at the top of the stairs with a

team of officers and walks to the parking lot across the street beginning at timestamp 00:00:37.

    ix. At timestamp 00:01:40, Officer Morgan fires his less lethal shotgun while still standing near the parking lot. It is unclear who his target is.

    x. At timestamp 01:45:46, Officer Morgan gives his name to another officer.

h. Officer Daniel McCameron's Body Worn Camera from May 30, 2020, COA-General Protest.022552, shows the shooting of Ms. Martin but the shooting of Mr. Herrera is off-screen.

    i. At the relevant time, Officer McCameron appears to be positioned at ground level near the base of the stairs.

    ii. At timestamp 23:51:24, Ms. Martin throws the disposable water bottle and it hits the street.

    iii. At timestamp 23:51:26, Officer McCameron fires his less lethal shotgun once in Ms. Martin's direction.

    iv. At timestamp 23:52:24, the camera is not pointing at Mr. Herrera and Officer McCameron does not appear to fire his weapon.

i. Officer Christopher Salacki's Body Worn Camera from May 30, 2020, COA-General Protest.22608.

    i. At timestamp 23:51:26, the disposable water bottle that seems to have been thrown by Ms. Martin is visible, but the officer's less lethal shotgun obscures where she was standing at the time she was shot which appears to be approximately 23:51:28 on this video.

    ii. At timestamp 23:51:30, Ms. Martin can be seen fleeing as Officer Salacki aims his weapon at a different person, but does not fire.

    iii. Officer Salacki's view is obscured by reloading and directed to the right of Mr. Herrera's position during the entire time when he appears to have been shot.

    iv. At timestamp 23:52:50, Mr. Herrera is limping away from the officers.

    v. Neither Officer Salacki nor the officer wielding a less lethal shotgun next to him appear to fire during this period.

33

j. Officer Chad Smith's Body Worn Camera from May 30, 2020, COA-General Protest.22628, shows the shooting of Mr. Herrera.

    i. Officer Smith reaches the bottom of the stairs at timestamp 23:51:25, in time to see Ms. Martin fleeing.

    ii. At timestamp 23:52:25, Mr. Herrera flinches at the same moment a less lethal shotgun can be heard firing.

28. Jason Gallagher footage – Siegel and McCulloch Body-worn camera footage

a. This appears to be body worn camera footage from the Gallagher incident moments prior to Ms. Underwood being shot.

b. At timestamp 21:29:54 on both sets of footage, officers Salvador Gonzalez-Galvan and John Siegel sprayed Plaintiff Jason Gallagher with pepper spray while he was peacefully protesting on the embankment leading up to I-35.

c. While he was still blinded, Officer Bryan McCulloch shoved him from behind down the concrete hill at timestamp 21:29:59.

29. Bomani Barton Investigation

a. AIR1 video (COA-General Protest.019805)

    i. At 17:10:28 on May 30, 2020, a person with a red piece of clothing over one shoulder and a green and black shirt, later identified as Bomani Barton, is standing holding a small sign to his head and recording on a cell phone next to a stopped 18-wheeler on I-35.

    ii. At 17:10:41, Barton begins to flee approaching officers, climbing over the traffic barrier.

    iii. At 17:10:50, Barton is in the opposite lane from the officers and backing away, with one hand holding the sign and the other holding the red clothing. As Barton backs away, his head suddenly jerks backward and a small white object bounces off of his face at 17:10:52.

b. APD Internal Affairs Division Investigative Summary (COA-General Protest.017766)

    i. APD determined that Officer Kyu An shot Mr. Barton in the head, causing serious injury.

      ii.  Officer An claimed to be shooting at Barton, and to have hit his intended target. Even after having been shown the video, Officer An explained that Barton threw a rock and "he was gathering more items," but neither of these allegations is consistent with the video.

30.    Cesar Fuentez – Body-worn camera footage, COA-Ayala.000690

    a.  At 22:22:43, a man counsel has told me is Cesar Fuentez steps over the traffic barrier away from police on the left-hand side of the screen. He is wearing black shorts, a black t-shirt, a black mask, a black baseball cap, and black and grey backpack.

    b.  As Fuentez runs away from police, up the grass embankment, multiple officers open fire with less lethal weapons at 22:22:47.

    c.  As he reaches the top, Fuentez falls, apparently hit by the hail of less lethal weapons fire at 22:22:52.

31.    Brad Ayala Investigation

    a.  APD Internal Affairs Investigative Summary (COA-Ayala.001852)

        i.  APD determined that officer Nicholas Gebhart fired at Brad Ayala from 95 feet away at 5:25 pm on May 30, 2020.

       ii.  APD claimed that several officers identified Ayala as holding a rock before Ayala was shot. Officer Gebhart claimed that is why he shot Ayala.

      iii.  Ayala was struck in the head, immediately collapsed, and had to be carried to the ambulance.

      iv.  Officer Gebhart claimed in his interview that he was never told to consider the risk of the subject being more than 75 feet away, but confirmed that he estimated Ayala was 30 yards away.

    b.  Body-worn camera footage (COA-Ayala.000657)

        i.  Mr. Ayala is visible at timestamp 22:25:52 standing near a large political sign which says "Laurie Eiserloh" near the top of the grass hill, wearing khaki pants, a blue shirt, and a black backpack. His hands are at his sides when he suddenly collapses.

       ii.  Due to the resolution of the video and his distance from the camera, it is unclear if Mr. Ayala was holding anything.

Exhibit E

32.    Meredith Williams Investigation

    a.    APD Internal Affairs Investigative Summary (COA-General Protest.012433)

        i.    APD determined that Officer Joseph Cast likely shot Ms. Williams while aiming at a different person at 5:29 pm on May 30, 2020.

        ii.    Officer Cast explained that "I don't recall it but I would assume that I observed a suspect throw something" and that's why he opened fire.

        1.)    APD noted that the impact broke Ms. Williams' foot.

    b.    APD Memorandum to Joseph Cast (COA-General Protest.012449)

        i.    As a result of Officer Cast hitting a bystander, APD determined the use of force "was not objectively reasonable."

        ii.    Officer Cast was disciplined with a three-day suspension.

33.    Gemicah Volter-Jones Investigation

    a.    APD Internal Affairs Investigative Summary (COA-General Protest.014011)

        i.    APD determined that Officer Derrick Lehman fired a less lethal shotgun towards a crowd of people at 7 pm on May 30, 2020.

        ii.    APD noted that Gemicah Volter-Jones was struck on the inside of his right forearm by a bean-bag round.

        iii.    APD noted that Officer Lehman's supervisor instructed him to "Bean bag anybody that throws stuff" just before he opened fire.

        iv.    APD claims to have seen a person matching Mr. Volter-Jones' description throwing an object in the video. The report circles a man with a large afro-style hair cut throwing an object with his right hand.

        v.    Officer Lehman claimed that he targeted a person's abdomen from about 100 feet away.

    b.    Officer Lehman's Body Worn Camera Footage, "Enhanced" by APD (COA-General Protest.014724)

        i.    The person APD identified as throwing an object is visible at timestamp

36

00:12:14. He is standing behind and shoulder-to-should with numerous peaceful protesters. The object appears to be a disposable water bottle.

    ii. At timestamp 00:12:16, two seconds after the object identified by APD's internal affairs' report has been thrown, Officer Lehman fires his less lethal shotgun.

  c. Officer Lehman's report

    i. Officer Lehman's report likewise estimates his target was 100 feet away.

    ii. Officer Lehman claims in his report that his shot caused the target to drop an object and retreat.

34.    Jesse Barron Investigation

  a. Email from Keith Kirby (COA-General Protest.021638)

    i. APD determined that seven officers fired in the vicinity of APD headquarters at 7:30 pm on May 30, 2020, but could not resolve an allegation that one of them struck a volunteer medic, Jesse Barron, in the hand.

  b. APD Internal Affairs Investigative Summary (COA-General Protest.020025)

    i. APD lists seven officers, including Officer Mark Bozyk, as officers who fired from APD headquarters during the time Mr. Barron was shot.

    ii. APD notes that all of the seven officers fired during a less than two-hour period, but it cannot determine where they aimed their shots.

    iii. Each officer reported that "less-lethal shotguns were authorized to be deployed at individuals who threw projectiles at police officers," and each claimed they were firing at people who threw objects at officers.

  c. APD "Involved Officers Summary" (COA-General Protest.021397)

    i. This unsigned document states that Officer Daniel McCameron fired one shot "east towards the parking lot under N IH 35" at 6:51 pm, which is only one minute before Mr. Herrera was shot.

  d. APD "Review & Timeframe" (COA-General Protest.021395)

    i. This unsigned document appears to reflect a review of multiple body-

37

worn camera videos, but all of them begin recording within one minute of 7:00 pm except for Officer Callie Luca's video. It is my understanding that Officer Luca's body-worn camera footage has not been provided in discovery.

35.  Brandon Keeton Investigation

   a.  APD Internal Affairs Investigative Summary (COA-General Protest.027827)

      i.  At approximately 7:46 pm on May 30, 2020, APD determined that six different officers opened fire in front of APD headquarters with their less lethal shotguns.

      ii.  Brandon Keeton was shot in the side of his torso. Keeton reported to APD that the shots were "randomly sprayed" into the crowd when he was hit.

   b.  Keeton's cell phone video (COA-General Protest.028237)

      i.  Keeton's cell phone video is consistent with his claim to APD that he was peacefully filming the officers when he was shot.

36.  Spray painter shooting investigations

   a.  May 30 – APD Internal Affairs Investigation Summary (COA-General Protest.024539)

      i.  APD determined that Officer Timothy Cobaugh shot a protester for spray painting the sidewalk at 11 pm on May 30, 2020, after Officer Gadiel Alas told Cobaugh to "get her."

      ii.  Officer Alas explained that they did not arrest the target because they were stationed on "over watch" on I-35.

      iii.  The subject was spray painting "an acronym, all cops are bastards"

      iv.  Officer Cobaugh told Internal Affairs he believed this was "riotous behavior" justifying the use of less lethal under APD policy.

   b.  May 31 – APD Internal Affairs Investigation Summary (COA-General Protest.019369)
      i.  APD determined that Sergeant Jared Jensen instructed Officer Joseph Strother to shoot a person spray painting the sidewalk with a less lethal shotgun, and Officer Strother did so, at approximately 10:57 pm on May

31, 2020.

    ii. Officer Strother reported that he hit the subject in the buttocks.

    iii. Sergeant Jensen explained that he believed the person was engaged in "riotous behavior" by spray painting, justifying the use of the less lethal shotgun under APD policy.

37. Taylor Ellis Investigation

    a. Investigative Summary (COA-General Protest.025792)

        i. APD determined that officers Todd Gilbertson and Michael Crossen shot Taylor Ellis with less lethal shotguns on May 31, 2020.

        ii. Mr. Ellis reported that he was hit in his lower left hip and his left shoulder and allowed APD to photograph his injuries.

        iii. Officer Gilbertson reported to IA that "I don't recall who gave the orders or who gave the, I guess, rules of engagement but I was just targeting people that were throwing items at us."

        iv. Officer Gilbertson claimed to remember shooting Mr. Ellis, but not to remember why he shot him.

        v. Officer Crossen acknowledged that he fired at someone even though "there were people all around him," but could not remember shooting Mr. Ellis.

    b. Body-worn camera of Gilbertson (COA-General Protest.027730).

        i. At 3:29 pm (timestamp 20:28:59–20:29:38), APD Officers Michael Crossen and Todd Gilbertson fired repeatedly into a crowd of protesters on I-35.

        ii. One male protester with a green shirt, red backpack, and shorts, later identified as Taylor Ellis, is walking with his hands raised when he flinches and then falls to the ground as the officers fire in his direction at timestamp 20:29:37–20:29:38.

38. Christen Warkoczewski Investigation

    a. APD Internal Affairs Investigative Summary (COA-General Protest.023188)

39

     i.   APD determined that eight different officers were firing less lethal weapons into the crowd on I-35 when Christen Warkoczewski was hit in the head and leg at approximately 4:02 pm on May 31, 2020.

     ii.   One of the officers, Detective Lomovstev, stated that he shot at Ms. Warkoczewski because she was putting a traffic cone down on a deployed CS cannister.

     iii.   Officer Gilbertson stated he shot at Ms. Warkoczewski from 30 yards away because she had picked up a cone to put on a CS cannister.

     iv.   Officer Berry reported that he was ordered by Sergeant Tableriou to shoot anyone who moved towards a CS canister, so that is why he shot at Ms. Warkoczewski.

     v.   Officer Fisher likewise reported that during his briefing, conducted by "chiefs, commanders, and lieutenants," he as told to shoot less lethal at anyone who tries to "manipulate" CS cannisters. He reported that he shot someone who he believed was bending over to pick up a CS cannister. Officer Fisher stated he was firing at targets that were twenty to twenty-five yards away.

     vi.   Officer Irwin also reported shooting at Ms. Warkoczewski, and that he targeted her torso. Officer Irwin appeared to be concerned that it would be dangerous to touch the CS cannister or for it to be kicked back at officers.

  b.   Body-worn camera footage (COA-General Protest.023913)

     i.   At timestamp 21:02:14 Ms. Warkoczewski is seen picking up a traffic cone and moving towards a deployed CS cannister.

     ii.   Officers begin opening fire at 21:02:15.

     iii.   Ms. Warkoczewski places the cone on the pavement at 21:02:16 then immediately turns away, taking her hands off the cone.

     iv.   Officers continue to fire until Ms. Warkoczewski falls to the ground at 21:02:19.

39.   Samuel Kirsch Investigation

  a.   APD Administrative Investigation Case Summary (COA-General Protest.024686)

Exhibit E

      i.   APD determined that Officer Rolan Rast struck Samuel Kirsch in the face with a less lethal shotgun near I-35 at about 4:02 pm on May 31, 2020.

      ii.   APD noted that Mr. Kirsch was fleeing police and running on the median when he was hit.

      iii.   APD appears to suggest that Officer Rast was aiming at a different person who had recently thrown an object and was standing behind Mr. Kirsch when Officer Rast fired at him.

  b.   Officer Rast's Body-worn camera footage (COA-General Protest.025036)

      i.   The footage reflects Officer Rast was firing multiple times at timestamps 21:02:29–42).

  c.   Drone footage (COA-General Protest.025038)

      i.   Mr. Kirsch falls at 0:22 duration.

      ii.   Based on the relative positions of the protesters, this appears to be during the time Officer Rast is firing.

40.   Anthony Evans and Justin Howell Investigations

  a.   APD Administrative Investigation Case Summary (COA-General Protest.011455)

    1.)   Introduction

       a.)   "On May 31, 2020, Officer Kyle Felton #8900 was on-duty and in a crowd control assignment in front of the Austin Police Department's (APD) Headquarters (the "Main") during ongoing protests. During this assignment, he was involved in a response to resistance (R2R) incident in which he discharged his less lethal shotgun at a subject engaged in throwing items at the police. At least one round is believed to have struck a subject, later identified as Anthony Evans, in the head causing serious bodily injury."

    2.)   Summary of Facts

       a.)   "On May 31, 2020, Officer Felton was assigned to work downtown with other APD units during the protests

       b.)   Officer Felton is certified to carry a less lethal shotgun and was

41

tasked with this assignment during parts of his workday

c.) Officer Felton has independent recollection of the individual he observed throwing items towards officers stationed on the steps of the main patrol building

d.) Officer Felton has independent recollection of discharging his less lethal shotgun at the same individual

e.) Officer Felton did not observe the less lethal round impact the individual he targeted

f.) Officer Felton did not observe Mr. Evans being impacted" (COA-General Protest.011546)

b. Investigative Summary Incident #20-5021608 (COA-Evans.000107)

a.) This appears to be a short summary of the investigation and its disposition.

b.) The author states that Kyle Felton was one of the many APD officers assigned to the elevated portion of N IH-35.

c.) The summary states that Officer Felton deployed his shotgun in response to objects being thrown at officers.

d.) The summary states that, based upon review of BWC, a white male is seen throwing a metal water bottle at the officers on the front steps of APD headquarters.

e.) The same male is said to then be seen throwing his backpack at officers. The summary states that Anthony Evans was walking in the line of fire between Kyle Felton and the man who threw his backpack when Anthony was hit.

f.) The summary concludes based upon the timing of when Anthony is hit and the angle from which Felton was shooting that Officer Felton was the officer that hit Anthony Evans.

c. Officer Felton's June 1, 2020 Supplemental Report (COA-Evans.000108)

1.) "I officer Felton #8900 was assigned to work downtown protests near the main substation. At times, I carried a less lethal shotgun and deployed over an estimated 20 less lethal rounds. The exact number is unknown.

42

Due to the rapidly evolving and multiple subjects I targeted, I am unable to recall the exact description of each subject I impacted but the number was around 5-10 subjects.

2.)    "Each time I deployed the less lethal shotgun, I did so to stop subject's who I personally observed was actively engaged in riotous behavior or were throwing rocks, bottles or other dangerous projectiles at people and/or officers, creating a risk for injury. I was very careful to only fire the rounds when there was a clear and safe shot at the subject involved. Each time I fired a less lethal round I tracked the projectile to assure it hitting the intended target. To my knowledge, the rounds that I fired did not hit any unintended targets."

d.    Officer Felton's July 28, 2020 Supplemental Report (COA-General Protest.002037)

1.)    "On 05/31/2020 at approximately 1800, I was tasked to work protests downtown. At approximately 2100, I was told to move to the top of IH-35 SB proper and help control the rapidly evolving riot below. I was told by Sgt. Follette to obtain a less lethal impact weapon to use while monitoring the riots. While on IH-35 SB proper, I fired at several subjects for engaged in riotous behavior or for throwing rocks, bottles or other dangerous projectiles at people and/or officers, creating a risk for injury. After reviewing my BWC, I am unable to confirm how many subjects I impacted nor am I able to see the descriptions of any subjects impacted. Due to the extremely large number of subjects engaging in riotous behavior and the length at which I was constantly subjected to these several subjects, I am unable to recall the descriptions from memory of those impacted."

e.    APD Administrative Investigation Case Summary as to Howell (COA-Howell.000651)

i.    APD determined that "there is a high probability" that Justin Howell was shot with a beanbag round by either Officer Felton or Officer Teng. COA-Howell.000656.

ii.    APD notes that Mr. Howell was shot in the back of his head and collapsed to the pavement at 11:04:22. COA-Howell.655.

iii.    In his interview, Officer Felton told Internal Affairs that "I was given no clear direction but the implied and, direction was that, ya know, I was to obtain a less lethal to try to mitigate the violence from on top the bridge so that would imply that we were to impact individuals below." COA-

43

Howell.662. He claimed that, when he shot in Howell's direction, he was actually aiming at a person who had thrown his backpack.

    iv.    Officer Teng similarly stated "I didn't know what was in that backpack, I didn't know what he was gonna do after he threw the backpack so that's when I deployed my rounds." COA-Howell.666.

f.    HALO Video (COA-Evans.001034)

    1.)    The video shows the southbound access road to IH-35 at its intersection with 8th St. and the front steps of APD HQ. A crowd of protesters can be seen surrounding the APD HQ front steps. Most appear to have their hands up or are filming the scene using their phones.

    2.)    At 0:32, Mr. Evans can be seen walking from the bottom right corner of the video, walking south, toward the access road with his right hand above his head and hand closed into a fist. He walks to just past the corner of the sidewalk on the southwest corner of the intersection.

    3.)    At 0:43, a man can be seen throwing a backpack toward the line of officers from the crowd.

    4.)    At 0:45, Mr. Evans is hit by a less lethal round. He is walking around 10 feet behind the man that threw the backpack. Mr. Evans can be seen falling to the ground.

    5.)    At 0:46, Justin Howell is hit in the back of the head as he is walking away and falls to the ground.

    6.)    At no point in this video do Mr. Evans or Mr. Howell do anything that would warrant the use of force.

g.    Officer Felton Internal Affairs interview on October 6, 2020 (COA-Evans.000963)

    1.)    When asked to describe May 31, 2020, Officer Felton said the following:

    2.)    "So we get called out for overwatch. At the direction of my sergeant we – we quickly gather our things up, um, from where we were sitting, rush out, head through to 250. Uh, my sergeant tells me to, us try, to find a less lethal 'cause no one on our shift had one. He commands me to find one, uh, from an officer at 250 who wasn't using it. I find an officer. He gives me a bunch of loose less lethal ammo and, uh, a less lethal s- and the went instantly head up to, uh, 35. Uh, I had the less lethal for probably about an hour and a half.

3.)  Uh, and then obviously watching the video, y'know helps you recollect a lot better but it was a – full-blown riot the entire time I was there. […] what I witnessed, it was a full-blown riot of just every several times per minute officers getting assaulted, uh, people coming up and yelling the most violent things in our faces. Just constant threats left and right. People walking around with assault rifles in a crowd. It was just utter chaos. There was not much direction. There was no briefing prior to going there, um, so we were – were just kinda thrown into there. There was no specific, um, instructions on when to handle certain things certain ways or how to handle certain things. So, it for the most part from leadership on down it was new to everyone. No one had experienced that situation so on both their part and our part here was just a lot of chaos. No clear instruction on any tactical positioning or any – ya know, other than just basic Mobile Field Force applications.

4.)  Q: So you were assigned as a Mobile Field force officer or were you a Special Response team – SRT – officer? A: A Mobile Field Force."

5.)  "I was given no clear direction but the implied and, direction was that, ya know, I was to obtain a less lethal to try to mitigate the violence from on top the bridge so that would imply that we were to impact individuals below…in addition to that my sergeant was, following me around the whole time 'cause I was the only person that had the less lethal and, helping - trying to help point out people to impact so that was my - it was - it was not explicitly given but that was - it was pretty clear that that was the implied direction."

6.)  "I did notice they were sometimes inconsistent. Sometimes you would shoot one and have a – like a big arch and shoot but sometimes, you know it'd be a little bit low even though you're kinda aiming in the right in the same position."

7.)  "Q: What's your understanding of the rules of engagement when using a less lethal shotgun? A: For this specific incident the policy is anyone engaged in riotous behavior or is throwing rocks, bottles, or dangerous items that could create injuries to officers or anyone else and that was the main reason why the less lethal was - was used."

8.)  Speaking of the individual who threw a backpack: "So when he threw the water bottle I observed that. That's what made him catch my eye and it looked like … whatever it was, it looked like it made direct impact with the officers in the front on the front steps. If I recall correctly I believe I – I did not fire at that time on him because I didn't have a clear shot. There

45

was still a few people right behind him and right around him but then once h took off what seemed to me like perfectly good backpack he had, you know, been lugging around all day, you know, at the protests and it – he started swinging it as if it was so heavy that he had to swing it, it, I recall triggering the intel that we got the day before that there had been there had been - they had found IEDs, at bombs at protests at different cities and I thought, like, why would he be swinging a perfectly good backpack that he had, you know and that he's not gonna get back full of something heavy at officers. So when he began to swing that backpack, I recall that I - I felt it was imperative to impact him."

9.)    Q: What's your understanding of the rules of engagement when using a less lethal shotgun?

10.)    A: For this specific incident the policy is anyone engaged in riotous behavior or is throwing rocks, bottles, or dangerous items that could create injuries to officers or anyone else and that was the main reason why the less lethal was - was used."

41. Meredith Drake Investigation

    a.  General Offense Report (COA Drake 001)

        i.  APD determined that Officer Chance Bretches shot Meredith Drake at approximately 11:07 pm on May 31, 2020. COA Drake 0016.

    b.  Officer Bretches' Body-worn camera footage (COA Drake 0153)

        i.  At timestamp 04:06:19, Ms. Drake approaches the officers with her hands raised and explains they need assistance for an injured protester. The officer standing next to Officer Bretches directs her to bring the injured person forward.

        ii.  At timestamp 04:07:31, Ms. Drake leads a team of people carrying the unconscious, injured protester toward the police line. She has her hands raised over her head in a cross sign.

        iii.  Just as Ms. Drake gets close, Officer Bretches opens fire in her direction at timestamp 04:07:34.

    c.  Officer Pena's Body-worn camera footage (COA Drake 0339)

        i.  At timestamp 04:07:28, Officer Bretches' muzzle flash is visible and pointing directly at Maredith Drake's raised hands.

46

    d.   Officer Bretches' report (COA-General Protest.002142)

        i.   Officer Bretches filed a general report that explains he fired about 15 less lethal rounds at people he claimed to be "violent offenders, agitators, subjects who exhibited preparatory aggressive behavior towards officers and or subjects who appeared to be inciting a riot"

        ii.   Officer Bretches then supplemented his report three months later to summarize his body worn camera footage. For the period where he shot Drake, Bretches only describes firing at a white male who "just committed an assault" by throwing an unknown object.

42.    Policies and instructions on May 30, 2020

    a.   General Offense Hardcopy – Assault on Peace Officer[66]

        1.)   Commander Eveleth in his Initial Report on June 15, 2020[67]

            a.)   "On Friday, May 29th, I was the duty commander for APD and responded to the unrest that began that evening as part of the George Floyd protests. Throughout the weekend, I worked in the role of the duty commander and SRT Commander.

            b.)   Friday May 29th- At about 10:30PM, as the on-call duty commander for the week, I was advised of a group of protesters at the APD main Headquarters at 715 E. 8th Street.

            c.)   Based on the resources available to us, the less lethal shotguns were our only viable defense against subjects throwing dangerous objects at us from a distance. […] Although the rounds were sometimes rapid in succession, the officers firing the less lethal shotguns were tracking and aiming at the subjects throwing these items. They were communicating the suspect descriptions with each other."

            d.)   "For the most part, officers were discharging the less lethal at subjects who were throwing rocks from the rock embankment."

            e.)   Regarding Ayala, "On Sunday, the 31st, during the SRT morning briefing, I asked if anyone knew who fired the round that stuck

---

[66] COA-General Protest.001715.
[67] COA-General Protest.001725.

47

the subject. I was told it was Officer Gebhart and officers again verified that the subject was throwing rocks."

2.) Commander Eveleth indicates that officers were intentionally firing less lethal rounds into crowds and hitting the targets they intended to shoot. Commander Eveleth also indicates that many of the shots were fired intentionally at individuals not throwing rocks and APD leadership was aware of the injuries caused by the less lethal shotguns on May 30, 2020.

b. APD General Order 200.2 – De-escalation of Potential Force Encounters effective at time of protests[68]

1.) 200.2 DE-ESCALATION OF POTENTIAL FORCE ENCOUNTERS
When safe and reasonable under the totality of circumstances, officers shall use de-escalation techniques to reduce the likelihood for force and increase the likelihood of voluntary compliance. Nothing in this de-escalation policy requires an officer to place themselves in harm's way to attempt to de-escalate a situation. Recognizing that circumstances may rapidly change, officers may need to abandon de-escalation efforts after they have commenced. Understanding that no policy can realistically predict every situation an officer might encounter, the Department recognizes that each officer must be entrusted with well-reasoned discretion in determining the reasonable de-escalation techniques to use in a situation. This de-escalation policy is intended to complement, not replace or supersede, other portions of the APD Policy Manual or specific officer training that addresses de-escalation.

(b) Use of De-escalation Techniques – Employing de-escalation techniques may involve securing additional resources, tactical repositioning, and employing verbal persuasion.

1. Securing Additional Resources -- Officers may utilize additional resources which are reasonably calculated to lessen or possibly eliminate the need to respond to resistance in a situation. To the extent possible and reasonable, in light of the totality of the circumstances, officers should avoid physical confrontation until

---

[68] COA-General Protest.003061.

Exhibit E

such time as additional resources have arrived to assist. Additional resources may include:

> (a) less lethal weaponry;
> (b) additional officers;
> (c) officers with special training, such as CIT or CINT; or
> (d) any other persons whose presence may help de-escalate the situation(e.g., emergency medical professionals, interpreters, or supportive family members).

2.   Tactical Repositioning -- To delay or avoid physical confrontation, officers may wish to employ any one or more of the following tactical repositioning measures, to the extent possible and reasonable in light of the totality of circumstances:

> (a) maintain safe physical distance from the subject;
> (b) maintain cover behind existing or assembled physical barriers; or
> (c) communicate from a location that is concealed from the subject.

3.   Verbal Persuasion -- To the extent possible and reasonable under the totality of the circumstances officers may use one or more of the following verbal techniques to try to calm an agitated subject and promote rational decisions.

> (a) Treat the subject with dignity and respect, the way the officer would wish to be treated if they stood in the subject's shoes;
> (b) Listen to the subject's side of the story and permit them to express frustration;
> (c) Explain what the officer is doing, what the subject can do, and what needs to happen;
> (d) Explain why the officer is taking a specific action, again permitting the subject to respond and acknowledging their perspective;
> (e) If possible, provide the subject with alternatives, even though those alternatives may be limited;
> (f) Advise the subject of the consequences for noncompliance;
> (g) Offer reasonable, professional advice if it is expected to help; or
> (h) Provide the subject with reasonably sufficient time within which to respond to directives.

49

Exhibit E

c.       APD General Order 200.3 Response to Resistance effective at time of protests[69]

"200.3 RESPONSE TO RESISTANCE
While the type and extent of force may vary, it is the policy of this department that officers use only that amount of objectively reasonable force which appears necessary under the circumstances to successfully accomplish the legitimate law enforcement purpose in accordance with this order.

(a) Assessment shall be ongoing – As the circumstances of a situation change, the force necessary to affect a detention, arrest, search, or transportation of a subject or to protect officer or other persons from imminent harm may also change. Officers will therefore need to re-evaluate their determination of the appropriate response to resistance as circumstances change.

(b) Officer Discretion - Understanding that no order can realistically predict every situation an officer might encounter, it is recognized that each officer must be entrusted with well-reasoned discretion in determining the objectively reasonable response to resistance in each incident."

(c) Improvising Permitted - Circumstances may arise in which officers reasonably believe that it would be impracticable or ineffective to use a standard tool, weapon, or method provided by the Department. Officers may find it more effective or practicable to improvise their response to rapidly unfolding conditions they are confronting. In such circumstances, the use of any improvised device or method must still be objectively reasonable and used only to the extent which reasonably appears necessary to accomplish a legitimate law enforcement purpose.

(d) Injury to Officer Not Required - While it is the ultimate objective of every law enforcement encounter to minimize injury to everyone involved, nothing in this order requires an officer to actually sustain physical injury before applying objectively reasonable force.

(e) Reporting Required - Any complaint by a subject that an officer

---

[69] COA-General Protest.003063.

50

caused pain or injury shall be treated as a response to resistance force incident, except complaints of minor discomfort from unresisted handcuffing.

200.3.1 DETERMINING THE OBJECTIVE REASONABLENESS OF FORCE
Any interpretation of objective reasonableness about the amount of force that reasonably appears to be necessary in a particular situation must allow for the fact that police officers are often forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving, and the amount of time available to evaluate and respond to changing circumstances may influence their decisions. The question is whether the officer's actions are ""objectively reasonable"" in light of the facts and circumstances confronting him.

(a) When determining whether to apply any level of force and evaluating whether an officer has used objectively reasonable force, a number of factors should be taken into consideration. These factors include, but are not limited to:

1. Reasonable opportunity for the officer to engage in de-escalation;
2. The conduct of the individual being confronted as reasonably perceived by the officer at the time;
3. Officer and subject factors such as age, size, relative strength, skill level, injury/ level of exhaustion and number of officers versus subjects;
4. Influence of drugs and alcohol or mental capacity;
5. Proximity of weapons;
6. The degree to which the subject has been effectively restrained and his ability to resist despite being restrained;
7. Time and circumstances permitting, the reasonable availability of other resources to the officer;
8. Seriousness of the suspected offense or reason for contact with the individual;
9. Training and experience of the officer;
10. Potential for injury to citizens, officers and subjects;
11. Risk of escape;
12. Whether the conduct of the individual being confronted no longer reasonably
appears to pose an imminent threat to the officer or others; or
13. Other exigent circumstances."

51

d.    APD General Order 206 – Control Devices and Techniques effective at time of
protests[70]

"206.1 PURPOSE AND SCOPE
In an effort to reduce and minimize altercation related injuries to officers,
the public and subjects, the Department authorizes the use of selected
control devices. These control devices are approved in order to control
violent or potentially violent subjects. It is anticipated that the use of
these devices will generally result in fewer altercation related injuries to
officers and subjects. The order below is for the use and maintenance of
control devices.

206.1.1 PHILOSOPHY
The use of control devices upon a subject by an officer shall only occur
when the officer, while in the performance of his lawful duties
reasonably believes it necessary to gain control of the subject."

206.2.1 WHEN DEVICES MAY BE USED
When a decision has been made to control, restrain or arrest a violent,
threatening or escaping subject, an approved control device may only be
used when its use appears objectively reasonable under the
circumstances."

206.5 KINETIC ENERGY PROJECTILES

This department is committed to reducing the potential for violent
confrontations when such subjects are encountered. Kinetic energy
projectiles are less likely to result in death or serious physical injury.
Kinetic energy projectiles are approved by the Department and are fired
from 12 gauge shotguns that are clearly identified as less lethal shotguns.
Certain munitions can be used in an attempt to de-escalate a potentially
deadly situation, with a reduced potential for death or serious physical
injury."

206.5.1 DEPLOYMENT
Approved munitions are justified and may be used in an effort to compel
individuals to cease their actions when such munitions present a
reasonable option for resolving the situation at hand.

---

[70] COA-General Protest.003076.

Exhibit E

(a) Officers are not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved officers determine that deployment of these munitions cannot be deployed safely.
(b) The safety of hostages, innocent subjects and officers takes priority over the safety of subjects engaged in perceived criminal or suicidal behavior.

206.5.2 VERBAL WARNINGS
A verbal announcement of the intended use of the kinetic energy projectile should precede its application unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances.
(a) The purpose of the warning is for the following:
    1. Provide the individual with a reasonable opportunity to voluntarily comply.
    2. Provide other officers and individuals with warning that a kinetic energy weapon may be deployed.
(b) The fact that a verbal and/or other warning was given, or the reasons it was not given, shall be documented in any related reports, as well as any responses by the subject.
(c) When the less lethal kinetic energy projectile is deployed on scene, the officer carrying the weapon shall announce over the air as soon as practicable that the less lethal shotgun/40mm weapon was deployed and be acknowledged by the dispatcher.
(d) When given, the verbal warning should be "IMPACTING" to prevent any confusion as to which weapon system is being deployed.

206.5.3 EXAMPLES OF CIRCUMSTANCES APPROPRIATE FOR DEPLOYMENT
Examples include, but are not limited to, the following types of situations where the subject:
(a) Is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.
(b) Has made credible threats to harm himself or others.
(c) Is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers, creating a risk for injury.
(d) There is reasonable suspicion to believe that the subject has already committed a crime of violence and is refusing to comply with lawful orders.

206.5.4 ADDITIONAL DEPLOYMENT CONSIDERATIONS
(a) Before discharging projectiles, the officer should consider the

Exhibit E

following factors:

1. The subject's capability to pose an imminent threat to the safety of officers or others.

2. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.

3. The credibility of the subject's threat as evaluated by the officers present, and the subject's physical capacity/capability to carry out the threat.

4. The availability of other force options and their possible effectiveness.

5. Distance and angle to target.

6. Type of munitions employed.

7. Type and thickness of subject's clothing.

8. The subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

(b) The use of Kinetic Energy Projectiles should generally be avoided in the following situations unless the totality of the circumstances indicate that other available options reasonably appear ineffective, impractical, and the officer reasonably believes that the need to control the individual outweighs the risk of using the Kinetic Energy Projectile.

1. As a breaching tool for windows in vehicles, especially when the vehicle is occupied.

2. As a breaching tool for windows of a structure, especially if it places occupants at risk of injury.

(c) An officer who is currently assigned to Special Operations Command and who has been trained in the use of Kinetic Energy Projectiles as a breaching tool may use that technique in a way that is consistent with their training.


206.5.5 SHOT PLACEMENT AND DEPLOYMENT DISTANCES

Officers should generally follow their training instructions regarding minimum deployment distances and target areas. The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death.

The head and neck should not be intentionally targeted, however any target area or distance may be considered when it reasonably appears necessary to accomplish immediate incapacitation in order to prevent serious injury or death to officers or others.

206.5.6          REPORT OF USE

All kinetic energy projectile use shall be documented in the related incident report/supplements and notification made to a supervisor in

54

Exhibit E

compliance with General Order 211 (Response to Resistance Inquiry, Reporting and Review).

(a) Specific information on the use of a kinetic energy projectiles should include, but is not limited to, the following:

1. Articulable reasons for the use of the kinetic energy projectile weapon.

2. Information on the type of individual who was subject to the kinetic energy projectile(s) (e.g., age, sex, health conditions).

3. Any special circumstances surrounding the use of the kinetic energy projectile(s).

4. Whether the kinetic energy projectile(s) application was successful.

5. Where the projectile(s) impacted the subjects body.

6. Number of kinetic energy projectiles deployed.

7. Number of times subject was impacted by kinetic energy projectile(s).

8. Approximate distance the kinetic energy projectile(s) was deployed from the subject.

(b) Photographs of impact sites should be taken. Expended projectiles should be collected and the expended projectile(s) shall be submitted into evidence for future reference. The evidence packaging should be marked ""Biohazard"" if the projectile(s) penetrated the subject's skin."

43. Changes to APD Policy 206 Control Devices and Techniques effective March 17, 2021.

a. "206.5.3 EXAMPLES OF CIRCUMSTANCES APPROPRIATE FOR DEPLOYMENT Examples include, but are not limited to, the following types of situations where the subject:

(a) Is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b) Has made credible threats **or is actively attempting** to harm himself or others.

(c) Is engaged in riotous behavior ~~or is~~ **related to or consisting of** throwing rocks, bottles, or other dangerous projectiles at people and/or officers, **buildings, or vehicles**, creating a **high** risk for **substantial** injury **or property damage**.

(d) There is reasonable suspicion to believe that the subject has already committed a crime of violence and is refusing to comply with lawful orders."

206.5.4 ADDITIONAL DEPLOYMENT CONSIDERATIONS

Exhibit E

"(b) The use of Kinetic Energy Projectiles should generally be avoided in the following situations unless the totality of the circumstances indicate that other available options reasonably appear ineffective, impractical, and the officer reasonably believes that the need to control the individual outweighs the risk of using the Kinetic Energy Projectile.

> 1. As a breaching tool for windows in vehicles, especially when the vehicle is occupied.

> 2. As a breaching tool for windows of a structure, especially if it places occupants at risk of injury.

> 3. **On obviously pregnant females, elderly individuals, obvious juveniles, individuals who are handcuffed or otherwise restrained, or individuals whose position or activity may result in serious collateral injury (e.g., falls from height, operating vehicles).**

(c) An officer who is currently assigned to Special Operations Command and who has been trained in the use of Kinetic Energy Projectiles as a breaching tool may use that technique in a way that is consistent with their training.

**(d) Kinetic Energy Projectiles shall not be used for crowd control (e.g. demonstrations).**

**(e) Kinetic Energy Projectiles shall not be fired into a crowd.**"

44. Cmdr. Jason Staniszewski – Protest Activity AAR from July 27, 2020[71]

    a. In response to a request from APD leadership to gather feedback for purposes of compiling an AAR, Commander Staniszewski provided a summary of his unit's feedback to APD leadership.

> 1.) The report complains that Chief Manley was insufficiently supportive of the officers' actions during the protests and in the press following the protests.

> 2.) The report said that APD leadership turned a "blind eye" to the use of less lethal kinetic projectile weapons. The report complains that there should have been APD Chiefs and Commanders giving guidance on less lethal kinetic projectile weapons to officers to prevent the incidents that did happen.

> 3.) The report said that there were numerous chiefs and commanders watching these events play out but that they were

---

[71] COA-General Protest.0045298.

silent.

45. APD Response to Protest Activity AAR Guide – Offs. Juusola and Smith – July 16, 2020[72]

   a. This email chain contains feedback from individual officers on the instruction and supervision they were given by APD leadership on the days of the protests.

      i. Officer David Smith writes that he is a member of the Special Response Team that worked on the weekend of May 30 and 31, 2020.

      ii. Officer Smith complained that officers did not have any plan, goals, or expectations from APD leadership, nor any guidelines for "response to resistance."

      iii. Officer Smith said that Chief Manley was on the APD headquarters front porch at some point during the protests.

      iv. Officer Juusola stated that he asked SRT leadership if there was a plan for the weekend on May 29, 2020. He stated that SRT leadership responded only that they were "planning this day by day."

      v. Officer Juusola said that APD leadership told officers to use less lethal devices on protesters in lieu of deploying CS gas.

46. OPO Objection Packet – December 9, 2020[73]

   a. Farah Muscadin, Director of the Office of Police Oversight, sent this objection packet appearing to document her office's objections to the IA investigations of many uses of force by APD during the protests.[74]

   b. The OPO's overarching objection is that IA appears to have conducted bad faith investigations with the intention to exonerate officers, even where policy violations were obvious.[75]

   c. The OPO's relevant consistent complaints across investigations are 1) the IA asked leading questions of subject officers and witnesses; 2) biased investigative summaries; and 3) officers were exonerated when there was a clear violation of policy.

47. OPO Draft Protest Report – June 29, 2021[76]

   a. OPO appears to have been preparing a report on its investigations into the

---

[72] COA-General Protest.0198625.
[73] COA-General Protest.0839334.
[74] COA-General Protest.0839334.
[75] COA-General Protest.0839337.
[76] COA-Gallagher 5418-5429.

Exhibit E

protests that was not finished.

b.  OPO characterizes APD's response to the protests as "disorganized and disproportionate.[77]

c.  OPO states that officers were give "little guidance beyond 'protect the main.'" [78]

d.  Further, OPO found that APD officers were "charged with ensuring that protesters did not compromise APD headquarters rather than allowing for strategic planning to allow protesters to demonstrate and ensuring safety for both officers and the community." [79]

48.  APD IA R2R Taskforce Final Report – November 9, 2020 – COA-General Protest.0179094

a.  APD's IA department produced this report documenting their effort to review APD officers' uses of force from the protests.

b.  R2R Taskforce estimated that there were approximately 719 deployments of less lethal weapons during the protests.[80]

c.  Analyzing the use of less lethal weapons, the R2R Taskforce concluded that "it is imperative that the Department devise better training and equipment practices for these rounds."[81]

d.  The Report further stated that "The Department needs to provide more robust training in the use of less lethal shotguns, and that training needs to specifically address riot and protest situations. The training also needs to address shooting from an elevated platform."[82]

e.  Additionally, the Taskforce further stated that the "rules of engagement were also unclear to many officers."[83]

49.  APD After Action Report – APD Response to 2020 Protests – September 16, 2022 - COA-General Protest.00987690

a.  APD found that "More than 700 bean bag rounds, a less lethal munition utilized by law enforcement, and baton strikes were deployed by officers as were CS (2-chlorobenzalmalononitrile) gas and OC (oleoresin capsicum) spray.[84]

---

[77] COA-Gallagher 5422.
[78] COA-Gallagher 5422.
[79] COA-Gallagher 5422.
[80] COA-General Protest.0179102.
[81] COA-General Protest.0179104.
[82] COA-General Protest.0179104.
[83] COA-General Protest.0179104.
[84] COA-General Protest.987694.

58

Exhibit E

    b.   APD confirmed that the "Department's response lacked a consistent vision, a clear mission and objectives, and well-defined expectations."[85]

    c.   APD further confirmed that "As opposed to documenting each individual application of force with specific details, officers were instructed to omit this reporting requirement and to document all force applications in a single report that was a supplement to the daily master report number. This created numerous reporting and data collection issues given the current records management system and methodology for collecting and analyzing the data."[86]

    d.   APD stated that the department's "response demonstrated that there was a lack of thorough and standardized understanding of crowd management, riot control techniques, tactics, and protocols."[87]

50.    Former Chief Manley's Deposition on April 27, 2021

    a.   Excessive force

        1.)   Chief Manley testified that he knew prior to the protests that utilizing kinetic projectile weapons from unsafe distances had a significant risk of serious injury to those impacted.[88]

        2.)   Chief Manley testified that he knew that the less lethal kinetic projectile weapons could cause serious bodily injury or death if used incorrectly and that use of the less lethal kinetic projectile weapon could constitute deadly force under APD policy.[89]

        3.)   Chief Manley said that no use of deadly force would have been permissible against Anthony Evans or Justin Howell in front of APD headquarters.[90]

        4.)   Chief Manley said he saw cases of officers using less-lethal at protesters where he did not believe the use of force was appropriate.[91]

        5.)   Chief Manley stated that nothing in APD policy prohibited the shooting of less lethal kinetic projectile weapons into crowds at the time of the protests.[92]

---

[85] COA-General Protest.987701.
[86] COA-General Protest.987709.
[87] COA-General Protest.987710.
[88] Deposition of B. Manley at 33-34.
[89] Deposition of B. Manley at 44.
[90] Deposition of B. Manley at 21 and 45.
[91] Deposition of B. Manley at 12.
[92] Deposition of B. Manley at 162-163.

Exhibit E

6.)     Chief Manley said Officer Felton shot Mr. Evans with the beanbag.[93]

7.)     Chief Manley said there was no conduct from the crowd on May 31st that would have justified deadly force.[94]

8.)     Chief Manley reviewed the video and said he did not observe any conduct from Mr. Evans that he was, or was about to be, a threat.[95]

9.)     Chief Manley said shooting into a crowd at a distance where accuracy cannot be certain and which causes serious injury to multiple people is dangerous and wrong.[96]

10.)    Chief Manley said it is not appropriate to shoot someone who is not a threat.[97]

11.)    Chief Manley said the video evidence at the time of the Evans and Howell shootings was that there was not riotous behavior.[98]

12.)    Chief Manley said a less-lethal kinetic projectile weapon is never to be used as a crowd control tool and he knew that the use of beanbags were dangerous to use in a crowd situation.[99]

b.    Duty to intervene

1.)     Chief Manley said officers have a duty to intervene if they see unconstitutional behavior by another officer and the APD has a written policy requiring officers to intervene.[100]

2.)     Chief Manley said that no specific instruction was given on the duty to intervene during the protests.[101]

---

[93] Deposition of B. Manley at 22.
[94] Deposition of B. Manley at 45.
[95] Deposition of B. Manley at 91.
[96] Deposition of B. Manley at 103.
[97] Deposition of B. Manley at 135.
[98] Deposition of B. Manley at 158-159.
[99] Deposition of B. Manley at 229.
[100] Deposition of B. Manley at 8-9.
[101] Deposition of B. Manley at 9.

60

3.)   Chief Manley said that he was not aware of any instance where an officer was disciplined for failing to intervene to prevent unconstitutional actions.[102]

c.   Less lethal kinetic projectile weapons

i.   Chief Manley said that he and the rest of APD leadership knew about the safe parameters and effective ranges of the less lethal kinetic projectile weapons at the time of the protests.[103]

ii.   Chief Manley also stated that if an officer is unsure that they are able to strike the intended target or if an officer is using the less lethal kinetic projectile weapon beyond its safe range, then the officer is not using the weapon appropriately.[104]

iii.   Chief Manley said it was obvious that Mr. Evans was more than 25 yards from the officer and that the accuracy of the beanbag shot diminishes at more than 25 yards.[105]

iv.   Chief Manley said if he had known officers were firing beanbag shotguns at more than 75 feet, he would have put a stop to it.[106]

d.   Protest injuries

i.   Chief Manley received a text message from a City Council member Greg Casar on May 30, 2020 reporting that an Austin Police Officer shot a peaceful protester in the forehead with a beanbag, as well as other injuries.[107] This was later determined to be the Ayala shooting.

ii.   Chief Manley testified that he investigated, and officer Gebhart acknowledged shooting someone, but was unable to provide any details of that purported investigation during his deposition.[108]

51.   Current APD Chief of Police Joe Chacon's Deposition on October 27, 2021

a.   Use of less lethal kinetic projectile weapons

---

[102] Deposition of B. Manley at 9-10.
[103] Deposition of B. Manley at 54.
[104] Deposition of B. Manley at 95-96.
[105] Deposition of B. Manley at 56-57.
[106] Deposition of B. Manley at 58.
[107] Deposition of B. Manley at 68-71; COA-General Protest.012024.
[108] Deposition of B. Manley at 68.

Exhibit E

    i.    Chief Chacon testified that he knew the safe distances and parameters for effective use of the less lethal kinetic projectile weapons that APD officers are taught.[109]

    ii.    Chief Chacon explained that shooting the less lethal shotgun at an angle is dangerous because it becomes more difficult to hit the intended target or the intended part of the body on a targeted individual.[110]

    iii.    Chief Chacon said that APD leadership knew that APD officers were shooting from unsafe angles on the weekend of the protests. Chief Chacon further said APD leadership should have given instruction to officers to stop shooting from unsafe angles, but that instruction was not given.[111]

    iv.    Chief Chacon said that APD officers should have considered shooting from at an angle and at an unsafe distance as unreasonably dangerous under existing APD policy.[112]

    v.    Chief Chacon said that Anthony Evans would not have suffered a serious head injury if the policy on kinetic energy projectiles had included a prohibition on shooting into a crowd.[113]

b.    Duty to intervene

    i.    Chief Chacon said that every APD officer that recognized that another officer was violating reasonable force policies or using less lethal kinetic projectile weapons outside of safe parameters should have intervened under APD policy.[114]

    ii.    Chief Chacon said that prior to September 2021 no APD officer had ever been disciplined for failing to intervene to stop excessive force or unlawful conduct to his knowledge.[115]

c.    Instruction from leadership

    i.    Chief Chacon said that fault for the injuries that occurred at the protests lies at many levels of APD, including leadership because they were not

---

[109] Deposition of J. Chacon at 206-207.
[110] Deposition of J. Chacon at 207.
[111] Deposition of J. Chacon at 211-212.
[112] Deposition of J. Chacon at 219.
[113] Deposition of J. Chacon at 224.
[114] Deposition of J. Chacon, 216.
[115] Deposition of J. Chacon, 101-102.

Exhibit E

prepared and did not make necessary adjustments or give clear rules of engagement or instruction.[116]

**The Uses of Deadly Force by APD Officers were Inconsistent with Generally Accepted Police Practices, Excessive, and Objectively Unreasonable**

52.    Police officers are trained about the U.S. Supreme Court's landmark decisions in *Graham v. Connor* and *Tennessee v. Garner.* Police are trained that those decisions held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake. Police are trained that this balancing test is achieved by the application of what the Court labeled the objective reasonableness test. Thus, police are trained to use factors, based on *Graham* and *Garner*, in determining the amount of force to use: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight. In my experience, all minimally competent police officers in the United States have this training and know they are supposed to reflexively apply this analysis. Likewise, minimally competent police supervisors know they must hold their officers to this standard.

53.    Police are further trained that objective reasonableness is determined in relation to the totality of the circumstances. Police are trained to evaluate a use of force in the context where it was made; meaning that an officer receives more deference for split-second judgments in tense circumstances concerning the amount of force required compared to situations where an officer has more time to before a response is necessary. Officers are thus trained that the reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Police officers are trained and prepared to assess dangerous situations and respond accordingly. Police officers are trained that for their force to be appropriate the level and manner of force must be proportional to the level of resistance and threat with which they are confronted. Police are trained that proportionality means there is a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

54.    Any reasonable or minimally competent police officer would know that specialty impact munitions, or kinetic energy munitions, are used in situations dealing with aggressive subjects when a less-than-lethal response is needed. Impact of a low-density projectile with the body inflicts blunt trauma, causing pain compliance in the subject to alter

---

[116] Deposition of J. Chacon, 114.

behavior. These munitions can be divided into two types: multiple and single projectiles. Multiple projectile impact munitions are typically used in crowd control situations to alter the behavior of a crowd. The multiple projectile impact munitions have relatively poor accuracy and are typically skip-fired off the ground at a crowd to impact the lower extremities of the body to avoid serious injury to vital organs such as the eyes. Single projectile impact munitions—the type APD used throughout the May 2020 protests— are designed primarily to target a single individual with a relatively low risk of collateral damage. Their accuracy allows them to be fired directly at the body to inflict blunt trauma to specific areas of the body, with the goal of minimizing the risk of serious injury. The response to the impact can include distraction, behavior alteration, or complete incapacitation. Single projectile impact munitions are marketed as useful to disarm aggressive subjects in hostage or suicide situations, or to target and mark specific individuals in a rioting crowd, but all of these purposes have significant caveats because the weapons are sold as "*less* lethal"—rather than "*non*-lethal"—for a reason.[117]

55.    Less-lethal weapons are particularly dangerous if they hit vulnerable body parts. APD's training warns that targeting the head, neck, face, eyes, chest, groin, low back, or spine with a less lethal shotgun should be considered lethal force by the officer.[118] Likewise, APD training and policy reflects that 40 mm launchers exert deadly force if they hit the head, neck, spine, or groin.[119] Instead, to actually live up to its name-sake, APD training provides that the primary target area should be the large muscles of the thigh, buttocks, and calf—with secondary options being the abdomen, shoulders, knees, or elbows.

56.    Police officers are trained that whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* and *Garner* factors. Police officers are trained that there must be objective or articulable factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient. Based upon my review of the video and evidence of the incident, Officer Heim used force against Ms. Sanders which any reasonable or minimally competent officer would recognize to be improper. Based on the evidence, the use of force against Ms. Sanders was objectively unreasonable, excessive, and was inconsistent with generally accepted police practices. Moreover, it was inconsistent with APD's written training materials.

---

[117] Kapeles, J.A., Bir, C.A. Human Effects Assessment of 40-mm Nonlethal Impact Munitions. Hum Factors Mech Eng Def Saf 3, 2 (2019). https://doi.org/10.1007/s41314-019-0017-5 (linked from Defense Technology: https://www.defense-technology.com/wp-content/uploads/2020/03/Human-Effects-NL_IM.pdf#:~:text=40MM%20projectiles%20that%20attenuate%20the%20impact%20energy%20through,and%20discoloration%20to%20the%20skin%20and%20muscle%20tissues.

[118] Less lethal shotgun LP, COA-General Protest.009695.

[119] 40 mm launder lesson plan, COA-AYALA.001724; COA-AYALA.001800; COA-AYALA.001801–3; COA-AYALA.001816, 1818.

Exhibit E

57.    There are body worn camera videos showing officers firing into the crowd from a raised freeway overpass.  These officers are firing multiple rounds from a distance that far exceeds the effective distance of the less lethal projectile.[120]

58.    There is no evidence that either Mr. Talley or Mr. Rodriguez presented an immediate threat to anyone at the moment that officers fired less-lethal projectiles at him from the overpass.  Moreover, Mr. Talley was struck several times after he was on the ground and while he posed no threat and Mr. Rodriguez was struck by two rounds.

59.    Thus, the decision to fire at Mr. Talley and Mr. Rodriguez were objectively unreasonable, excessive, conscious shocking, and inconsistent with generally accepted police practices even if the shot was not aimed at Mr. Talley.

60.    The use of force against Mr. Talley and Mr. Rodriguez was consistent with APD's extensive history of excessive force as documented above.

61.    In this case, based on the totality of the circumstances, a reasonable police officer would not have used any force on Mr. Talley or Mr. Rodriguez.  They were not a threat to any individual at the moment he was shot. The application of force was unreasonable, excessive, and inconsistent with generally accepted police practices. Indeed, the uses of force against Mr. Talley and Mr. Rodriguez, whether he was the intended target or merely an intentionally accepted risk of collateral damage, was so inappropriate and contrary to accepted police practices that in my opinion it is outrageous and shocking to the conscience.

### APD Policymakers Adopted Highly Dangerous Policies Concerning the Use of Less Lethal Kinetic Projectile Weapons and the Use of Force on May 30 and May 31, 2020

62.    Chief Manley, the policymaker for the Austin Police Department at the time of the protests, adopted policies and practices that directly led to his officers inflicting injuries onto numerous innocent protesters.  Any reasonable chief of police would know that the use of less lethal kinetic projectile weapons by officers carries the potential for serious injuries to those shot.  Any reasonable chief of police would not have adopted policies and practices of shooting less lethal kinetic projectile weapons into crowds, from unsafe distances, from elevated positions, at heads, and without justification.

63.    Both former Chief Manley and Chief Chacon in their depositions stated that they and the rest of APD leadership were aware of the potential dangers of less lethal kinetic projectile weapons at the time of the protests.

---

[120] *See*, COA 4588 (Cherne), COA 4613 (Alas), COA 4613 (Heathershaw), COA 4619 (Cobaugh).

Exhibit E

64.    Knowing these facts, a reasonable police chief would have adopted policies and practices to ensure that officers do not use less lethal kinetic projectile weapons in an unsafe manner.

65.    Further, a reasonable police chief would adopt policies that would ensure that officers do not fire less lethal kinetic projectile weapons into crowds because of the risk of harm to innocent individuals.

66.    However, APD officers reported that they were given direct instructions to engage in the same dangerous conduct that caused this shooting on the days of May 29, May 30, and May 31, 2020.

   a.    Heim's supervisor told SIU that they were deployed with less lethal weapons like Heim's 40 mm launcher specifically for crowd control.[121] Heim likewise stated he was instructed to use the 40 mm launcher for "any riotous crowd control."[122]

   b.    Officer Kyle Felton, who is alleged to have shot Justin Howell and Anthony Evans, described the direction he received as: "I was given no clear direction but the implied and, direction was that, ya know, I was to obtain a less lethal to try to mitigate the violence from on top the bridge so that would imply that we were to impact individuals below…in addition to that my sergeant was, following me around the whole time 'cause I was the only person that had the less lethal and, helping - trying to help point out people to impact so that was my - it was - it was not explicitly given but that was - it was pretty clear that that was the implied direction."

   c.    When Officer Siegel was asked if he received any instructions or briefing from command staff, he said "I just got vague instructions from the other officers. Or I guess not instructions. Vague information from the other officers that were already there."[123]

   d.    Other officers would later describe their instruction: "With the extensive amount of less lethal rounds there were being fired into the crowd the first couple of days, there should have been some Chiefs or Commanders giving guidance to these officers to prevent what happened."[124]

   e.    APD's R2R Taskforce similarly concluded that "officers were unclear on the general rules of engagement during the protest" and that "it is clear the

---

[121] COA-Sanders 0054 at 1:20.
[122] COA-General Protest.015522.
[123] Deposition of J. Siegel at 66.
[124] COA-General Protest.0045296

66

Department did not provide this guidance [on rules of engagement] in the first days of the protest."[125]

f.   Even by Chief Chacon's assessment, "the fault lies at many levels, including at the supervisory level, but, you know, honestly, it goes -- it goes up to the highest levels, as well that we, at that moment, were not prepared and -- and we needed -- we did -- and we did, in the coming days after that, do a better job of making adjustments, preparing, providing clearer rules of engagement and other instruction."[126]

67.   The written APD policy in place at the time of the protests concerning kinetic projectiles was:

a.   206.5.3 EXAMPLES OF CIRCUMSTANCES APPROPRIATE FOR DEPLOYMENT
Examples include, but are not limited to, the following types of situations where the subject:
(a) Is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.
(b) Has made credible threats to harm himself or others.
(c) Is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers, creating a risk for injury.
(d) There is reasonable suspicion to believe that the subject has already committed a crime of violence and is refusing to comply with lawful orders.

b.   206.5.4 ADDITIONAL DEPLOYMENT CONSIDERATIONS

(a) Before discharging projectiles, the officer should consider the following factors:
1. The subject's capability to pose an imminent threat to the safety of officers or others.
2. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.
3. The credibility of the subject's threat as evaluated by the officers present, and the subject's physical capacity/capability to carry out the threat.
4. The availability of other force options and their possible effectiveness.
5. Distance and angle to target.
6. Type of munitions employed.

---

[125] COA-General Protest.0179106-7
[126] Deposition of J. Chacon at 114.

Exhibit E

7. Type and thickness of subject's clothing.

8. The subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

68. The written policies adopted by the City of Austin did not prohibit the use of less lethal kinetic projectile weapons to shoot into crowds, from unsafe distances, from elevated positions, at vulnerable body parts, or without justification.  Obviously, a better policy can and should have been implemented, as APD later changed this policy to forbid using the weapons for crowd control.

69. The practices adopted by the APD's policymakers, Chiefs Manley and Chacon, were evident in how its officers acted on May 29, May 30, and 31, 2020 as well as in the ratification of those actions by APD leadership.

    a.  APD leadership directed officers to use less lethal kinetic projectile weapons in patently unsafe tactical scenarios without justification for the danger to protesters. Because of the limitations on less lethal shotguns and launchers, the weapons were necessarily unsuited to each of these deployments:

        i.  APD generally instructed officers to use less lethal kinetic projectile weapons by shooting at people in crowds.

        ii.  APD officers were directed to use less lethal kinetic projectile weapons from the front porch of APD headquarters despite the obviously dense crowd. This resulted in several cases of documented serious injuries such as the Barron, Keeton, Herrera, Drake, and Martin shootings.

        iii.  APD officers, including Off. Siegel, were specifically deployed to the IH-35 overpass with instructions to use less-lethal kinetic projectile weapons even though they were necessarily at an improper angle above the dense crowd on the west side. This caused several documented serious injuries to other innocent protesters, such Nicole Underwood, Anthony Evans, and Justin Howell.

        iv.  APD officers were repeatedly instructed to clear IH-35 and the hill to the east using less lethal shotguns and launchers, even though they were again facing an obviously dense crowd each time and, once they reached the hill, they were again not level with their ostensible targets creating a necessarily dangerous angle. This caused several cases with documented serious injuries such as in the Barton, Williams, Kirsch, Warkoczewski, Ellis, Ayala, Fuentez, and Arawn shootings.

Exhibit E

    v.   APD officers, including Heim, were deployed to form a human road block on Cesar Chavez and engage in crowd control, even though they knew the crowd was very large and had spilled into the street, causing this injury to Alyssa Sanders. A similar tactic had led an officer to shoot Volter-Jones the day before. The road block then attempted to clear the street, even though that procedure had led to the aforementioned unjustified injuries on IH-35.

b.  Even where APD supervisors did not give explicit instruction, APD officers were directed by APD leadership to use less lethal kinetic projectile weapons in an unsafe manner by being told to fire at anyone who engaged in "riotous behavior" or threw an object, despite the obvious prevalence of dense crowds of innocent bystanders. This is the exact reasoning Heim tried to use to explain his actions.

c.  APD officers were not reminded to keep their targets within 20 to 75 feet, or to only shoot at extremities, despite the known danger of causing excessive penetration at close range or dramatically losing accuracy and hitting a target in more likely lethal locations of the head, chest, or groin beyond the effective range.

d.  APD training failed to warn officers of the danger of firing at an excessive downward angle. APD's internal R2R Taskforce recognized that APD's training "needs to address shooting from an elevated platform."[127]

e.  Further, APD leadership ratified the conduct of its officers by investigating the officers' conduct and failing to discipline any officer for his or her intentional actions on the weekend of May 29-31, 2020.

f.  A reasonable or minimally competent police chief would not give instruction to officers to use less lethal kinetic projectile weapons in places and at times where any use would be highly dangerous and in violation of APD policy.

g.  A reasonable or minimally competent police chief would discipline officers that used unsafe and excessive force, violated APD policies on use of force, or violated APD policies on duty to intercede.

h.  Any reasonable or minimally competent police chief would understand that choosing to not discipline any officers for any of their conduct would express approval from APD leadership of the officers' actions.

---

[127] COA-General Protest.0179104.

Exhibit E

70.     APD officers throughout the weekend shot into crowds, at innocent people, from unsafe distances, from elevated positions, at vulnerable body parts, and without justification.

71.     Even with the benefit of hindsight, many officers' after-the-fact justifications are extremely troubling. Virtually none of the officers acknowledge that they dangerously fired into a dense crowd of mostly peaceful protesters. This is an obviously problematic way to use a less lethal weapon—which is so-called because it is still a deadly weapon. Heim has not been disciplined even though the investigation revealed he fired into a fleeing, dense crowd for no legitimate reason.

72.     Even ignoring the obvious risk to bystanders, the officers' constructed narratives from body-worn camera footage appear to be oblivious to the lack of justification for their actions. For example, shooting a person for spray painting (without even a warning), as at least four officers decided was appropriate, with a less lethal weapon is absurd. Even taking the officers' self-serving positions at face value, most instances of force appeared to be retaliatory, rather than preventative—for example, just like Heim's shooting of Sanders, the officers who shot Williams, Drake, Evans, Howell, and Kirsch, among others, all claim (at least in their interviews after they have watched footage of the shooting) that the person they were aiming at *had* thrown an object, past tense. In Underwood, Siegel claimed not to remember shooting but also that all of his shots were justified by people throwing objects. Videos of other shootings such as the Martin, Warkoczewski, and Ayala shootings similarly reflect that whatever the target *had* been doing, they were no longer any conceivable threat by the time they were shot. The same would be true if Heim had aimed and hit the person he identified in the video as having thrown the water bottle. But law enforcement officers are not charged with penalizing people for breaking the law; they should only use force if necessary to carry out the law or protect from harm. It cannot be over-stated how basic this principle is to a functional police force, and yet it appears dozens of officers, including Heim, intended to injure hundreds of citizens in a single weekend because this concept was not taught to them and not enforced.

73.     APD's deficient policies and practices concerning less lethal kinetic projectile weapons during the protests are evident through the body worn camera footage and other videos depicting how APD officers misused less lethal kinetic projectile weapons.

74.     In a highly publicized incident on May 30, 2020, Levi Ayala was shot in the head with a less lethal kinetic projectile weapon on the east embankment of IH-35.  He was shot in the head, at an angle, and without justification.  He suffered serious injuries and was taken to the hospital.

75.     It is well known in policing that firing less-lethal kinetic energy devices into crowds may cause serious injuries or deaths.  Indeed, 14 people have been killed in the United States and Canada since 1971 and the death of Victoria Snelgrove on October 21, 2004 after the Boston Red Sox won the World Series received national attention and significant

attention from the policing community.[128]  Indeed, in 2019, the International Association of Chiefs of Police recommended that, "Impact projectiles shall not be fired indiscriminately into crowds," and recommended that beanbag rounds fired into crowds should only be used to respond to a deadly threat by stating, "Direct-fired impact munitions, to include beanbag and related projectiles, may be used during civil disturbances against specific individuals who are engaged in conduct that poses an immediate threat of death or serious injury."[129]

76.     Both Chief Manley and Chief Chacon testified that they were told of the injuries to Mr. Ayala on May 30, 2020 but did nothing to change policies or instructions to APD officers regarding the use of less lethal weapons.  A reasonable police chief would have changed the policies and practices to prevent further excessive force at the moment he or she was put on notice of injuries like those to Mr. Ayala.

77.     Chief Manley was also alerted to the unacceptable injury to Ms. Underwood by Siegel shooting her in the chest from the same text message chain on May 30, 2020.

78.     Despite actually knowing about the Ayala and Underwood shootings specifically, the practices generally, and that protesters were being seriously hurt by APD officers with less lethal kinetic projectile weapons, APD leadership did not change any of the instructions or policies provided to APD officers and instead continued to place officers in dangerous positions with less lethal kinetic projectile weapons.

   a.     Officers continued to fire at targets who posed no danger to people.

   b.     Officers continued to fire rapidly with less lethal weapons into crowds.

   c.     Officers continued to fire at unacceptable range, into crowds, and with an unacceptable lack of precision.

---

[128] *See,* "The Tragedy in Boston: The impact projectile death of Victoria Snelgrove," Police 1 (Dec.1 ,2007) https://www.police1.com/police-products/less-lethal/projectiles-launchers/articles/emtragedy-in-bostonem-the-impact-projectile-death-of-victoria-snelgrove-pOAEJHNfvAivymNj/#:~:text=Tragedy%20in%20Boston%3A%20The%20impact%20projectile%20death%20of%20Victoria%20Snelgrove; AELE Monthly Law Journal (Nov. 2012) listing cases involving injuries due to kinetic energy devices being fired into crowds, https://www.aele.org/law/2012all11/2012-11MLJ101.pdf; "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," PERF (2006) at 59-60, https://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20-%20identifying%20issues%20and%20successful%20approaches%202006.pdf; "Crowd Control That Can Kill: Can American Police Get a Grip on Their New, 'Less-Lethal' Weapons Before They Kill Again? Policy Brief, Harvard, Kennedy School of Government (Oct. 2005), https://www.hks.harvard.edu/sites/default/files/centers/rappaport/files/brief_lesslethal.pdf#:~:text=If%20there%20is%20any%20single%20incident%20that%20clearly,the%20rest%20of%20us%E2%80%94would%20have%20done%20the%20same.%E2%80%9D.
[129] IACP Law Enforcement Policy Center, "Crowd Management," (April 2019) at 5, https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

Exhibit E

d.    Officers continued to fire at targets who no longer posed any conceivable threat in an effort to retaliate at people who they believed had previously thrown objects.

e.    The next day, dozens of officers, including Heim, were again specifically issued kinetic projectile weapons with the expectation that they would again be deployed for crowd control duties in exactly the same way that the policymaker knew had caused unacceptable injuries the day prior. Then those officers were specifically deployed to perform crowd control for dense crowds.

f.    These actions were a natural consequence of the City's adopted policies.

79.    APD leadership further approved the instances of excessive force using less lethal kinetic energy weapons by failing to discipline the vast majority of APD officers as a result of their use of less lethal shotguns and launchers on May 29, 30, or 31, 2020.  Indeed, as discussed below, after two years, APD has intentionally not taken any disciplinary action or made any findings regarding any of the officers who used force and who are under criminal investigation, yet those officers are currently performing law enforcement duties in the field.

80.    The problems in APD's policies and practices are further evidenced by the changes that APD leadership made to policies concerning less lethal kinetic projectile weapons in 2021. APD specifically inserted instructions in March 2021 to prohibit firing into crowds using less lethal kinetic projectile weapons and the use of less lethal kinetic projectile weapons as a crowd control tool, specifically giving demonstrations as an inappropriate time to use a less lethal kinetic projectile weapon.

81.    The APD policies and practices of firing into crowds, from unsafe distances, from elevated positions, at vulnerable body parts, and without justification were clearly the moving force of the injuries to Talley and Rodriguez and other individuals shot on May 29, 30, and 31, 2020. Both Chief Manley and Chief Chacon testified that if the policies concerning less lethal kinetic projectile weapons and use of force had been changed prior to May 30, 2020 that people like Sanders would not have been injured.

82.    Knowing the dangers of the less lethal kinetic energy weapons as the policymakers in this case did before the protests, no reasonable policymaker would have adopted the policies and practices of shooting less lethal kinetic energy weapons into crowds, from unsafe distances, from elevated positions, at protesters' centers of mass, and without justification.

83.    APD's policy of shooting less lethal kinetic projectile weapons into crowds, from unsafe distances, from elevated positions, at protesters' vulnerable body parts, and without

Exhibit E

justification each fell below the minimum acceptable standards for policing in the United States.

84.    Accordingly, APD's policies of shooting less lethal kinetic projectile weapons into crowds, from unsafe distances, from elevated positions, at protesters' vulnerable body parts, and without justification were each unreasonable and highly dangerous.

85.    Moreover, each of these policy decisions independently caused the uses of excessive force throughout the protests, including as to Mr. Talley and Mr. Rodriguez. If APD had actually limited officers from shooting into crowds, or the distance of engagement, or shooting from an elevated position, or shooting when there was any risk of hitting a protester's vulnerable body parts, or shooting when there is not an imminent threat to justify the use of force, any one of those limitations would have prevented the officer who shot Ms. Sanders.

### The City of Austin and APD Adopted a Policy and Practice of Failing to Intervene to Prevent Excessive Force

86.    Any reasonable chief of police would know that a practice of failing to ever discipline officers for failing to intervene to prevent excessive force creates a policy and practice of failing to intervene in his or her department. Thus, any reasonable police chief would put into place policies and practices to ensure that officers actually intervene to prevent excessive force or other unconstitutional actions.

87.    APD's written policy on the Duty to Intercede is as follows:

    a.    "200.1.3 DUTY TO INTERCEDE

        Any officer who observes another officer using force shall intercede to prevent further harm if the officer knows that the force being used is not objectively reasonable and the officer has a reasonable opportunity to prevent the harm."[130]

88.    This policy, if enforced, would compel officers to act to prevent other officers from using excessive and objectively unreasonable force.

89.    However, former Chief Manley testified that no officer had ever been disciplined under this provision of the general orders to his knowledge.

90.    Further, Chief Chacon testified that no officer in the history of the APD had been disciplined for failing to intercede until October 2021.

91.    This is true despite the long history of excessive force by APD, including in numerous incidents where multiple officers were present. These incidents are exemplified by those court decisions I have reviewed as well as APD's own annual response to

---

[130] COA-General Protest.003061.

Exhibit E

resistance reports.

92.    The report on APD's training academy further corroborates that APD did not even train its officers on this policy at the time most active-duty officers went through the academy.

93.    Both former Chief Manley and Chief Chacon additionally testified that no officer was investigated after the protests on May 30 and 31, 2020 for failing to intercede to prevent excessive force.

    a.    Chief Chacon conceded that if officers saw other officers using less lethal shotguns and launchers at unsafe ranges or at an unsafe angle that they had a duty to intervene.

    b.    Yet, Chief Chacon provided no explanation as to why no officers were investigated for failing to intercede to prevent any of the shootings on May 30 or May 31, 2020.

    c.    Indeed, no officer was investigated for failing to stop their fellows from inflicting the serious injuries summarized in this report. In this instance, no officer stopped Heim from aiming and shooting into an extremely dense crowd, despite dozens of officers clearly seeing his conduct. Moreover, Officer Ash intentionally fired twice into a mass of protesters just seconds earlier, yet he was only investigated for his later conduct of accidentally firing his less lethal shotgun into the ground several minutes later—and no officers did anything about his earlier conduct.

94.    The continued failure to even investigate instances where officers witnessed excessive force but did nothing to intervene constituted a practice of simply not intervening when APD officers used excessive force.

95.    Any minimally competent police chief would recognize that a widespread practice of never investigating or disciplining this behavior would be dangerous and likely to cause misconduct as occurred in this case.

96.    Accordingly, no reasonable chief of police would fail to conduct an immediate investigation into the officers that did not do anything to prevent the brazenly unsafe use of less lethal kinetic projectile weapons that caused numerous life-threatening injuries.  Turning a blind eye to these failings has sent a message to all officers that the department condones the failure to intervene and the violation of the constitutional rights of those shot.

97.    Thus, this widespread practice of never enforcing the duty to intervene caused the excessive force during the protests, including to Mr. Talley and Mr. Rodriguez.

**The Pattern, Practice and Custom of Failing to Complete an Administrative Investigation Until the Criminal Investigation has Been Concluded is Inconsistent with Generally Accepted Police Practices and Sends a Message to Unprincipled Officers that they can Violate an Individual's Constitutional Rights with Impunity**

98.    Both Chief Manley and Chief Chacon testified that it is the practice of the APD to not issue any sort of finding or discipline on administrative allegations until the criminal case has been completed even when all of the information is available to the department to make findings.[131]

99.    As described above, Heim's conduct of shooting into the crowd should have been found to violate APD policies, but instead he has not been disciplined. Indeed, in some cases APD has admitted or found violations, but still not disciplined the officer. For example, in the related Underwood case, APD Commander Chris Vallejo concluded that "Officer Siegel's lack of articulation and lack of legal justification for firing his less-lethal shotgun may have violated various aspects of the department's response to resistance policies." Nevertheless, APD has refused to issue any sort of finding or discipline for Officer Siegel's conduct.

100.    There are several reasons why it is inappropriate to hold an administrative investigation until the conclusion of a criminal investigation. First, the criminal justice system takes a significant amount of time. It could be more than a year, and often several years, before a criminal case is adjudicated in the court. The officer, the department, and the community all deserve a resolution within a reasonable period of time and waiting for the resolution of the criminal trial typically would I keep any of these goals.

101.    Second, the standard of proof in an administrative investigation is substantially different then for a criminal charge. Criminal cases require proof beyond a reasonable doubt, which means that the finder of fact must be entirely convinced and satisfied with moral certainty that the evidence supports the conclusion that the defendant is guilty of the charged crime. The standard of proof for an administrative action is a preponderance of evidence, which means that is more likely than not that the officer committed misconduct. The preponderance of evidence standard is a substantially lower hurdle and much easier proof than the beyond a reasonable doubt standard.

102.    Third, the criminal investigation may be controlled by an outside agency where the department lacks the ability to seek a timely outcome. That is the case here, where Travis County is pursuing the prosecution.

103.    Fourth, some agencies believe that *Garrity* prevents the department from conducting

---

[131] Deposition of B. Manley at 14-15 "Long standing practice." Deposition of Chacon at 18 (all of the information that is needed to make an administrative determination is already known to the APD) and there is a "long standing" practice of waiting for the criminal investigation to conclude before making an administrative finding at 26.

Exhibit E

administrative interrogation of the subject officer until the criminal case has been concluded.  In fact, *Garrity* does not prevent the agency from conducting an investigation for interrogation and there is a generally accepted practice in policing to separate the administrative and criminal investigations to prevent *Garrity* issues.[132]

104.    Fifth, the failure to conclude the administrative investigation may impact the department's ability to change policies and training to prevent similar future occurrences.

105.    Finally, the failure to conclude administrative investigation sends a message to unprincipled officers that there are no consequences for their misconduct and they may engage in unconstitutional acts with impunity as the offending officer has been returned to normal duty status with no consequences, as in this case, for over two years.

106.    This policy directly conflicts with minimum acceptable police standards. Any minimally competent police chief would recognize that this policy is unacceptable and encourages misconduct by officers.

107.    This policy of delaying or effectively completely dropping administrative investigations during a criminal proceeding is therefore unreasonable.

108.    This policy caused the misconduct here, as it contributed to the aforementioned practice of excessive force and failure to intervene.

**APD Internal Affairs and Leadership Have Failed to Conduct Good Faith Investigations and Ratified Unlawful Conduct by APD Officers**

109.    Any reasonable chief of police would ensure that the department's internal investigations are done in good faith and with an objective of determining if an officer has violated any policies or requires discipline. Generally accepted police practices are to investigate officers' actions in a way consistent with investigating any other unlawful actions. However, the APD Internal Affairs investigations of protest related complaints were not done in good faith and had obvious deficiencies that suggest the objective of IA was to exonerate officers rather than identify wrongdoing.

110.    The Office of Police Oversight in its role as monitoring the work of IA objected to many the investigations that have concluded related to the protests. OPO specifically raised several systemic issues across all investigations:

    a.    IA asked leading questions of subject officers and witnesses

    b.    IA produced biased investigative summaries that favored officers

---

[132] See, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight," (2009) Jeffrey J. Noble and Geoffrey P. Alpert at 110-112, "Building Trust Between the Police and the Citizens They Serve," (2010) USDOJ at 24.

Exhibit E

    c. IA exonerated officers even where there was a clear violation of policy.

    d. IA recommended education-based discipline in all cases rather than suspension, even in cases where less lethal was deployed or OC sprayed on protesters without reason where typically education-based discipline is inappropriate.

111. In summary, OPO complaints that APD fails to comply with department policies and gives deference to officers "at the detriment of the community."

112. It is my opinion that the APD IA conducted its investigations in a manner that was calculated to exonerate officers like the officer who shot Nicole Underwood.

113. As a result, APD leadership effectively adopted a practice of ratifying APD officers' unlawful uses of force at the protests.

114. Any minimally competent police chief would recognize that conducting investigations in this manner would undermine officer discipline and cause widespread misconduct—as in fact APD has demonstrated in the years leading up to the protests, and throughout the protests before and after Talley and Rodriguez was shot.

115. Thus, APD's procedures for internal investigations are unreasonable.

116. Moreover, these sham investigations contributed to the aforementioned widespread practice of excessive force and failure to intervene, as they amount to an additional assurance to officers that they will not be accountable to APD for that misconduct.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

_____    ___5/4/23_____

Jeffrey J. Noble    Date

Exhibit E